# 23-7575

## In the
## United States Court of Appeals
### For the Second Circuit



ELG UTICA ALLOYS, INC.,

*Plaintiff-Counter-Defendant-Appellant,*

– v. –

NIAGARA MOHAWK POWER CORP., DBA NATIONAL GRID,

*Defendant-Counter Claimant-Third Party Plaintiff-Cross Claimant-Cross Defendant-Appellee,*

*(See inside cover for continuation of caption)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF NEW YORK (SYRACUSE)

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFF- COUNTER-DEFENDANT-APPELLANT

DAVID L. COOK
PHILLIPS LYTLE LLP
228 East Main Street, Suite 210
Rochester, New York 14614
(585) 238-2000
dcook@phillipslytle.com

STEVEN W. ZOFFER
PETER T. STINSON
BRETT W. FARRAR
DICKIE, MCCAMEY & CHILCOTE, P.C.
Two PPG Place, Suite 400
Pittsburgh, Pennsylvania 15222
(412) 281-7272
szoffer@dmclaw.com
pstinson@dmclaw.com
bfarrar@dmclaw.com

*Attorneys for Plaintiff-Counter-Defendant-
Appellant ELG Utica Alloys, Inc.*

————————————————

- and -

SPECIAL METALS CORP. and EMPIRE RECYCLING CORP.,

*Defendants-Cross-Defendants-Appellees,*

GENERAL ELECTRIC COMPANY,

*Defendant-Cross-Defendant-Cross-Claimant-Appellee,*

CHICAGO PNEUMATIC TOOL COMPANY, LLC,

*Defendant-Cross-Defendant-Cross-Claimant-Counter-Claimant-Appellee,*

NATIONAL GRID GROUP PLC,

*Defendant,*

– v. –

CBS CORPORATION, (successor-in-interest to
Westinghouse Electric Corporation)
AKA PARAMOUNT GLOBAL,

*Third-Party Defendant-Cross-Defendant-Appellee.*

————————————————

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellant ELG Utica Alloys, Inc. makes the following disclosure and states that it is a wholly owned subsidiary of ELG Utica Alloys Holding Corp.

ELG Utica Alloys Holding Corp. is owned by ELG Utica Alloys International GmbH, which is owned by ELG GmbH.

Aperam S.A. is the ultimate parent company of ELG GmbH. Aperam S.A., a publicly listed company organized under the laws of the Grand Duchy of Luxembourg, indirectly holds 100% of the shares in ELG Utica Alloys, Inc.

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................2

CONCISE STATEMENT OF THE CASE ................................................3

    I.    Statute of Limitations ................................................5

        A. The Utica Alloys site number 633047 ............................6

        B. The Universal Waste site number 633009 ......................8

    II.   Spoliation.............................................................12

        A. Records from the Utica location ................................13

        B. Records from storage units.......................................16

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT

    I.    Statement of the Standard of Review .......................................20

    II.   The Universal Waste site is a CERCLA facility separate
        from the Utica Alloys site.........................................21

    III.  Application of the single-remediation principle is
        illogical, unfair and contravenes CERCLA's objectives
        and remedy selection process ................................................24

        A. The District Court's decision frustrates the regulatory process
           designed to promote effective remediation...................................26

i

B. Application of the single-remediation principle is unfair to ELGUA in this instance ...................................................29

C. The District Court's application of the single-remediation principle is illogical in this case...................................31

D. The District Court's application of the single-remediation principle undermines CERCLA's statutory objectives.................33

IV. The 2007 IRMs did not constitute a CERCLA remedial action .........................................................................36

A. The 2007 IRMs lack the hallmarks of permanent CERCLA remedial action ..............................................................28

B. The 2007 IRMs targeted specific contaminants after they were released into the environment and migrated from the original source and did not eliminate the contamination ...........................44

C. The NYSDEC determined conditions giving rise to the IRMs posed a significant threat to public health/environment and the IRMs were implemented in a short time .......................................45

V. The District Court abused its discretion by determining ELGUA spoliated evidence because the factual underpinnings for that determination are based upon speculation and controverted evidence that ELGUA knowingly destroyed relevant documents................................49

A. The District Court's conclusion that ELGUA's obligation to preserve evidence encompassed the documents destroyed in March 2014 is based upon supposition and speculation...............51

B. The District Court abused its discretion by determining ELGUA is grossly negligent .......................................56

CONCLUSION ...................................................................60

# <u>TABLE OF AUTHORITIES</u>

**Page**

## <u>Cases:</u>

*Adorno v. Port Auth. Of New York & New Jersey,*
    258 F.R.D. 217 (S.D.N.Y. 2009) ........................................................59

*Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,*
    473 F.3d 450 (2d Cir. 2007)...............................................................20

*AMW Materials Testing, Inc. v. Town of Babylon,*
    584 F.3d 436 (2d Cir. 2009) ........................................................57, 60

*B.F. Goodrich v. Betkoski,*
    99 F.3d 505 (2d Cir. 1996)................................................................35

*Brooklyn Natural Gas Co. v. Exxon Mobil Corp.,*
    480 F. Supp. 3d 430 (E.D.N.Y. 2020) ............................................21

*Byrnie v. Town of Cromwell Bd. of Educ.,*
    243 F.3d 93 (2d Cir. 2001)................................................................56

*Chin v. Port Auth. Of New York & New Jersey,*
    685 F.3d 135, 162 (2d Cir. 2012) cert. denied 569 U.S. 904 (2013)...............57

*Cooper Crouse-Hinds, LLC v. City of Syracuse,*
    568 F. Supp. 3d 205 (N.D.N.Y. 2021)....................................... 22-23

*Curcio v. Roosevelt Union Free Sch. Dist.,*
    283 F.R.D. 102 (E.D.N.Y. 2012) .....................................................54

*Cytec Indus. v. B.F. Goodrich Co.,*
    232 F. Supp. 2d 821 (S.D. Ohio 2002) ............................................41

*Dataflow, Inc. v. Peerless Ins. Co.,*
    2013 U.S. Dist. LEXIS 183398 (N.D.N.Y. June 6, 2013) ............ 57-58, 58, 59

*Fujitsu Ltd. v. Fed. Express. Corp.,*
    247 F.3d 423 (2d Cir. 2001)..............................................................51

*Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc.,*
  920 F.2d 1415 (8th Cir. 1990)......................................................38, 40

*In re Pfizer Inc. Sec. Litig.,*
  288 F.R.D. 297 (S.D.N.Y. 2013) ..............................................54

*Kelly v. E.I. DuPont de Nemours & Co.,*
  17 F.3d 836 (6th Cir. 1994)......................................................47

*Key Tronic Corp. v. United States,*
  511 U.S. 809 (1994) ..................................................................33

*Khaldei v. Kaspiev,*
  961 F. Supp. 2d 564 (S.D.N.Y 2013).........................................50

*Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.,*
  880 F.3d 620 (2d Cir. 2018)......................................................50

*Kronisch v. United States,*
  150 F.3d 112 (2d Cir. 1998).......................................................54

*Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya,*
  248 F.R.D. 126 (S.D.N.Y. 2007) ...............................................53

*Minda v. United States,*
  851 F.3d 231 (2d Cir. 2017)..................................................57, 60

*Moreno-Godoy v. Kartagener,*
  7 F.4th 78 (2d Cir. 2021)...........................................................20

*MPM Silicones, LLC v. Union Carbide Corp.,*
  966 F. 3d 200 (2d Cir. 2020)...............24-25, 26, 27, 28, 30, 31, 32, 33, 35, 36,
                                              42, 44-45, 45-46, 47, 48

*MPM Silicones, LLC v. Union Carbide Corp.,*
  2015 U.S. Dist LEXIS 195720 (N.D.N.Y. Oct. 13, 2015) ...............56

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.,*
  808 F. Supp. 2d 417 (N.D.N.Y. 2011)...........................................32

*New York State Elec. and Gas Corp. v. FirstEnergy Corp.*,
766 F.3d 212 (2d Cir. 2014)..... 24, 28, 32, 33, 35, 37, 38, 39, 41, 42, 44, 45, 48

*New York v. Next Millennium Realty, LLC*
732 F.3d 117 (2d Cir. 2013).........................................................38, 45

*New York v. P.A. Indus.*,
No. 17-CV-1146 (DRH)(SIL), 2021 U.S. Dist. LEXIS 261381,
(E.D.N.Y. July 14, 2021) ...............................................................42

*New York v. Shore Realty Corp.*,
759 F.2d 1032 (2d Cir. 1985).........................................................21

*Niagara Mohawk Power Corp. v. Chevron USA, Inc.*,
596 F.3d 112 (2d Cir. 2010)...........................................................36

*Niagara Mohawk Power Corp. v. Consol. Rail Corp.*,
291 F. Supp. 2d 105 (N.D.N.Y. 2003)............................................21

*Nurad, Inc. v. William E. Hooper & Sons Co.*,
966 F.2d 837 (4th Cir. 1992)..........................................................23

*Orbit Comm'ns, Inc. v. Numerex Corp.*,
271 F.R.D. 429 (S.D.N.Y. 2010) ...................................................57

*Pizzella v. Liberty Gas Station & Convenience Store, LLC*,
410 F. Supp. 3d 42 (N.D.N.Y. 2019) .............................................50

*Razore v. Tulalip Tribes of Washington*,
66 F.3d 236 (9th Cir. 1995)............................................................47

*Scalera v. Electrograph Sys., Inc.*,
262 F.R.D. 162 (E.D.N.Y. 2009) ...................................................54

*Schaefer v. Town of Victor*,
457 F.3d 188 (2d Cir. 2006)......................................................41, 42

*South Macomb Disposal Auth. v. EPA*,
681 F. Supp. 1244 (E.D. Mich. 1988)............................................47

*Tchatat v. O'Hara,*
    249 F. Supp. 3d 701 (S.D.N.Y. 2017)................................................................50

*Treppel v. Biovail Corp.,*
    249 F.R.D. 111 (S.D.N.Y. 2008) ......................................................................53

*United States v. W.R. Grace & Co.,*
    429 F.3d 1224 (9th Cir. 2005)............................................................39, 40, 45

*West v. Goodyear Tire & Rubber Co.,*
    167 F.3d 776 (2d Cir. 1999)..............................................................................49

*Yankee Gas Servs. Co. v. UGI Utils., Inc.,*
    616 F. Supp. 2d 228 (D. Conn. 2009)........................................................38, 41

*Zubulake v. UBS Warburg LLC,*
    220 F.R.D. 212 (S.D.N.Y. 2003) ................................................................51, 53

**<u>Rules, Laws and Statutes:</u>**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1332 ...................................................................................1

28 U.S.C. §1367 ....................................................................................1

40 CFR § 300.430 ...............................................................26, 27, 42, 43

42 U.S.C. § 9601 ................................... 1, 3, 21, 36, 37, 38, 47

42 U.S.C. § 9607 ...........................................................................1, 26

42 U.S.C. § 9613 ...........................................................1, 25, 30, 34, 41

42 U.S.C. § 9621 ...............................................................................42

CERCLA § 107 ...........................................................................1, 2, 5

CERCLA § 113 ...........................................................................1, 2, 5

N.Y. Comp. Codes R & Regs. Tit. 6, § 375-1.2 ......................................37

## STATEMENT OF JURISDICTION

This action asserts claims under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 *et seq*.; under Article 12 of the New York Navigation Law; and for contribution under the New York Civil Practice Law and Rules ("CPLR") and New York common law, to recover costs and damages associated with the release or threatened release of hazardous substances resulting from scrap recycling and related operations occurring on property in an industrial area located in Utica, New York. The District Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 9607, 9613(b), 28 U.S.C. §§ 1331, 1332, and 1367.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1291 as an appeal from a final order and judgment. On March 27, 2023, the District Court entered a Memorandum-Decision and Order granting summary judgment and dismissing with prejudice Appellant ELG Utica Alloys, Inc.'s ("ELGUA") CERCLA § 107(a) claim, CERCLA § 113(f)(1) claim and declaratory judgment claim and granting in part a motion for spoliation sanctions. On October 2, 2023, the District Court entered an order resolving a sanctions issue and declined to exercise supplemental jurisdiction over ELGUA's remaining state law claims. The District Court entered judgment in Appellees' favor, dismissing with prejudice ELG

Utica Alloys, Inc.'s CERCLA § 107(a) claim, CERCLA § 113(f)(1) claim and

declaratory judgment claim and dismissing without prejudice the state law claims.

ELGUA timely filed its notice of appeal on October 25, 2023.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

WHETHER THE DISTRICT COURT ERRED BY DETERMINING THE UTICA ALLOYS, INC. SITE AND THE UNIVERSAL WASTE, INC. SITE CONSTITUTE ONE FACILITY UNDER CERCLA?

Suggested Answer: Yes.

WHETHER THE DISTRICT COURT ERRED BY DETERMINING THAT ELGUA'S CLAIMS FOR COST RECOVERY UNDER CERCLA ARE TIME BARRED BY APPLICATION OF THE SINGLE REMEDIATION PRINCIPLE?

Suggested Answer: Yes.

WHETHER THE DISTRICT COURT ERRED BY DETERMINING THE 2007 IRMs FOR THE EXCAVATION AND DISPOSAL OF LIMITED AREAS OF CONTAMINATED SOIL AND GROUNDWATER ON OR RELATED TO THE UTICA ALLOYS, INC. SITE CONSTITUTE A "REMEDIAL ACTION" AT THE SITE UNDER CERCLA?

Suggested Answer: Yes.

WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION BY DETERMINING THAT ELGUA SPOLIATED EVIDENCE WHEN THE RECORD ESTABLISHES THAT RELEVANT DOCUMENTS WERE NOT DESTROYED AND ELGUA DID NOT ACT IN A GROSSLY NEGLIGENT MANNER?

Suggested Answer: Yes.

## CONCISE STATEMENT OF THE CASE

ELGUA filed this action in the United States District Court for the Northern District of New York against Niagara Mohawk Power Corp. d/b/a National Grid, and later amended its Complaint to add Special Metals Corporation, General Electric Company, Empire Recycling Corp., and Chicago Pneumatic Tool Company, LLC, as additional Defendants.  ELGUA asserted claims under CERCLA, 42 U.S.C. §§ 9601 *et seq*.; under Article 12 of the New York Navigation Law; and for contribution under the CPLR and New York common law, to recover response costs and damages associated with the release or threatened release of hazardous substances resulting from scrap recycling and related operations occurring on property located near the intersection of Leland and Wurz Avenues in an industrialized area of Utica, NY, and referred to herein as "the Universal Waste site," which has been designated as Site No. 633009 on the New York State Registry of Inactive Hazardous Waste Sites.  The Universal Waste site comprises a portion of a 23-acre parcel (referred to herein as "the Site"), which in 1998 was administratively bifurcated by the New York State Department of Environmental Conservation ("NYSDEC") into the Universal Waste site and an approximate 1.5-acre parcel referred to herein as "the Utica Alloys site," designated as Site No. 633047 on the Registry.[1]

---

[1] Niagara Mohawk Power Corp. d/b/a National Grid brought a third-party action against Paramount Global, f/k/a CBS Corporation (successor-in-interest to

3

Historically, Universal Waste, Inc. ("Universal Waste") and Utica Alloys, Inc. ("Utica Alloys") occupied at least portions of the Site. Utica Alloys was formed in 1965 to "deal in, buy, sell and process all high and low temperature alloys…; to operate vacuum melt furnaces, found[]ries and deal generally in reclamation of alloys; [and] to process all non-ferrous materials." (JA-843). Universal Waste was formed in 1973 to "buy, sell, reclaim, manufacture, convert and deal in waste metal, waste paper, rags, iron, steel, [and] non-ferrous metals." (JA-846). ELGUA is the current owner of the Site. In 2008, ELG Haniel GMBH (n/k/a ELG GmbH) purchased Universal Waste, Utica Alloys and several other companies. (JA-764-832). Following the purchase, Universal Waste, Utica Alloys, and other companies were merged into Utica Alloys, Inc., which then changed its name to ELGUA. (JA-833-838; JA-839-841). Appellees are among the generators of hazardous substances disposed at the Site decades ago.

On June 1, 2022, Appellees jointly filed a Motion for Summary Judgment and Spoliation Sanctions and Damages. (JA-53-55). On March 27, 2023, the Honorable Brenda K. Sannes, Chief Judge for the United States District Court for the Northern District of New York, issued a Memorandum-Decision and Order granting

---

Westinghouse Electric Corporation) seeking contribution under Section 113 of CERCLA, the CPLR, and New York common law, and further seeking recovery under Article 12 of the New York Navigation Law. The Navigation Law claims were dismissed by Memorandum Decision and Order, dated October 10, 2019.

Appellees' motion for summary judgment, dismissing ELGUA's CERCLA §§ 107(a) and 113(f)(1) claims and declaratory judgment claim with prejudice on the grounds that ELGUA's claims are time barred. (SPA-56; JA-2515). Judge Sannes also granted Appellees' motion for spoliation sanctions but deferred the selection of an appropriate sanction.[2] (SPA-56; JA-2515).

The District Court, on October 2, 2023, declined to exercise supplemental jurisdiction over ELGUA's state law claims and entered judgment in Appellees' favor on October 2, 2023. (SPA-1; JA-2600). Also on October 2, 2023, ELGUA filed a Motion for Clarification and supporting Memorandum of Law requesting the District Court clarify the scope of the Memorandum-Decision and Order. (JA-2602-2604). On November 14, 2023, the District Court issued an order denying the Motion for Clarification. (JA-2617-2621). ELGUA timely filed its notice of appeal on October 25, 2023. (JA-2605-2607).

## I.    Statute of Limitations.

The Site consists of two portions, bifurcated by the NYSDEC on August 7, 1998. One portion of the Site, the approximate 21.5-acre Universal Waste site, has been identified by the NYSDEC in its Registry of Inactive Hazardous Waste Disposal Sites as site number 633009. The other portion of the 23-acre Site, the

---

[2] The parties stipulated to the amount of the deferred sanction and on October 2, 2023, the District Court entered an Order on the deferred sanction. (JA-2595-2598; 2599).

approximate 1.5-acre Utica Alloys site, has been identified in the NYSDEC's Registry of Inactive Hazardous Waste Disposal Sites as site number 633047.

Efforts to date have largely focused on investigating Site condition, the scope of which changed over time, depending on whether the Universal Waste site or the Utica Alloy site was involved. While Appellees argued that remedial action began as early as 1979, the District Court held that remedial action began in 2007 and did not address the earlier actions. (SPA-45; JA-2504).

A. The Utica Alloys site number 633047

On September 24, 1999, after NYSDEC bifurcated the Site, NYSDEC and ELGUA's predecessor entered an Order on Consent, index number A6-0001-98-08, relating to site number 633047, which Utica Alloys leased from Clearview Acres, Ltd ("1999 Consent Order"). (JA-1164). In 1999 Utica Alloys and Clearview Acres, Ltd. submitted, and NYSDEC approved, a work plan to perform a remedial investigation and feasibility study ("RI/FS") for the Utica Alloys site. (JA-1165). After the investigation and study evaluating possible remedial action options at the Utica Alloys site was completed and approved by NYSDEC, the performing parties were to cooperate and assist NYSDEC in soliciting public comment on a proposed remedial action. Thereafter, the NYSDEC would select a final remedial action for the Utica Alloys site documented in a Record of Decision ("ROD"). (JA-1167). The 1999 Consent Order also authorized Utica Alloys and Clearview Acres, Ltd. to

propose (and if approved, implement) Interim Remedial Measures ("IRMs") for the Utica Alloys site.  (JA-1167).

Under the 1999 Consent Order, on June 9, 2003, Utica Alloys' consultant proposed IRMs to mitigate specific risks at the Utica Alloys site identified during the ongoing remedial investigation.  (JA-1310-1313).  The RI/FS is currently in progress, and NYSDEC has not proposed a remedy or issued a ROD for the Utica Alloys site.  The NYSDEC approved the proposed IRMs ("the 2007 IRMs") following additional site characterization activities completed in 2005.  (JA-1315). The objectives of the IRMs were to (i) remove specific "hot spots" containing elevated levels of polychlorinated biphenyls ("PCBs") that exceeded recommended soil cleanup objectives, (ii) remove soil above the water table that contained elevated levels of trichloroethylene ("TCE") and associated volatile organic compounds ("VOCs") attributed to losses from a former aboveground TCE storage tank ("AST"), and (iii) monitor groundwater quality in the vicinity of the former AST to assess groundwater quality changes.  (JA-1316).

As approved by NYSDEC, performance of the 2007 IRMs and attendant reporting obligations were incorporated into the 1999 Consent Order. (JA-1167). NYSDEC provided no indication that the IRMs would be the final remedy for the Utica Alloys site. In total, 83.2 tons of PCB-impacted soil, 527.5 tons of TCE-containing soil, and 6,951 gallons of TCE-contaminated water were removed. (JA-

7

1412-1414). Sampling performed during the IRMs reflected exceedances of regulatory action levels, including several by orders of magnitude. (JA-1418-1419).

### B. The Universal Waste site number 633009

On May 5, 2000, the NYSDEC and ELGUA's predecessor entered an Order on Consent, index number A6-0001-98-04, relating to site number 633009, to conduct a preliminary investigation of the Universal Waste site ("2000 Consent Order"). (JA-1181). The 2000 Consent Order requires a Preliminary Site Assessment for the NYSDEC to determine whether hazardous wastes are present at the Universal Waste site and constitute a significant threat to public health or the environment necessitating remediation, and if additional data is necessary. (JA-1181-1182). The 2000 Consent Order did not require, or even contemplate, remedial action.

On June 7, 2012, the NYSDEC sent a notice letter asserting ELGUA is a party responsible for PCB and other contamination present at the Universal Waste site, the nearby Mohawk River and an associated wetland. (JA-1551). NYSDEC requested ELGUA to develop, implement and finance a two-phased "Remedial Program" for the Universal Waste site: (i) a remedial investigation to determine the nature and extent of contamination followed by a feasibility study to develop and screen/analyze remedial action alternatives; and (ii) the design and implementation of the final remedial alternative that NYSDEC would select in a ROD. The

NYSDEC sent identical notice letters to Appellees Special Metals Corporation and National Grid, advising them of their strict, joint and several liability as generators of hazardous substances disposed at the site. (JA-1552). The notice letter further advised that IRMs could be performed upon NYSDEC's approval. (JA-1552).

Following negotiations, the NYSDEC and ELGUA entered another Order on Consent and Administrative Settlement, index number A6-0793-12-08 ("2012 Consent Order"), requiring ELGUA to perform a limited RI of the Universal Waste site.[3] (JA-1584-1585). Special Metals Corporation and National Grid declined ELGUA's offer to participate.

On October 1, 2015, by which time ELGUA had ceased active operations at the Site, the NYSDEC and ELGUA entered into an Order on Consent and Administrative Settlement, index number A6-0850-15-03, regarding the Universal Waste site ("2015 Consent Order"). (JA-1631). Appellees National Grid and the successor to Special Metals Corporation, formally identified as responsible parties by NYSDEC, again declined to enter the Order despite notice and opportunity to participate. (JA-1631-1632). The Consent Order also confirms NYSDEC's

---

[3] The 2012 Consent Order was designed to help develop a general understanding of the Universal Waste site and evaluate potential human exposure pathways and environmental impacts, including identifying potential sources and types of contaminants and release mechanisms. (JA-1603, 1606). After much of the work had been completed and the remaining obligations were subsumed by the 2015 Consent Order, NYSDEC terminated the 2012 Consent Order in 2016. (JA-1776-1777).

intention to address an off-Site area defined as Operable Unit 2. The 2015 Consent Order requires ELGUA to prepare and submit a proposed Work Plan to evaluate alternatives for an IRM addressing areas identified as "the berm" and several "debris piles," all located on the Universal Waste site. (JA-1631-1632). ELGUA was not required to implement the IRM unless the NYSDEC accepted the Work Plan as proposed, or the parties agreed to modify it. (JA-1634).

The 2015 Consent Order also requires ELGUA to submit a Remedial Investigation/Feasibility Study Work Plan for assessing on-site conditions of the Universal Waste site, defined therein as Operable Unit 1, and, subject to securing access, off-site contamination of an area to be defined as Operable Unit 3. (JA-1631-1634). Following the conclusion of the RI/FS process, the Consent Order contemplates NYSDEC will issue a ROD for OU1 and, if created, OU3. ELGUA will then have 60 days to formally agree to implement the ROD. If ELGUA notifies NYSDEC that it will not implement the OU1 ROD (or, as applicable, the OU3 ROD), the Consent Order will terminate. (JA-1633).

In accordance with the 2015 Consent Order, ELGUA performed a focused feasibility study and an associated pilot study to evaluate alternative interim remedial measures to address the berm and 17 debris piles located on OU1. (JA-1704)). Following NYSDEC's approval, ELGUA removed the berm/debris piles in 2018 ("2018 IRMs"). (JA-1714). The IRMs were designed to facilitate completion

10

of the surface and subsurface investigation required as part of the ongoing RI/FS. (JA-1710). Following additional sampling, the excavated berm/debris piles were (i) characterized as hazardous or non-hazardous based on PCB concentrations in soil samples collected during multiple 2013-2018 sampling events, and (ii) shipped to their respective off-site disposal locations. (JA-1713). As reported to NYSDEC (JA-1704), ELGUA removed a total of 16,941 tons of soil, characterized as hazardous (3,548) or non-hazardous (13,393) waste. (JA-1718). In addition to PCBs and TCE, elevated lead levels were detected in the excavated soil. (JA-1716).

Apart from completing the IRMs to address the berm/debris piles, ELGUA continued NYSDEC approved remedial investigation activities at both OU1 and OU3, as provided in the 2015 Consent Order. The primary objectives of these activities include delineating the areal and vertical extent of constituents of potential concern in soil and underlying groundwater and collecting data to evaluate both actual/potential threats to human health and the environment and remedial alternatives to address any releases from OU1 and OU3. (JA-1789).

Pursuant to the 2015 Consent Order, in July 2020 ELGUA submitted a Supplemental Remedial Investigation Work Plan for Operable Units 1 and 3 – Revision 1. (JA-1779). Using the data collected during previous on- and off-Site investigations, including NYSDEC's investigation of OU2, to identify and address

11

data gaps, implementation of the Work Plan seeks to complete the RI for OU1 and OU3. This work is ongoing.[4] (JA-1790).

In summary, various activities have been taken at both the Utica Alloys and Universal Waste sites, differing in timing, scope and location. At no time, however, has a comprehensive RI/FS been completed. Further investigation, all under NYSDEC's oversight, continues. Likewise, NYSDEC has never issued a ROD formally selecting a remedy for any location or proposed/published one for public comment.

## II. Spoliation.

Following the purchase of Universal Waste and Utica Alloys, and the merger and name change (JA-833-838; JA-839-841), ELGUA moved its base of operations from Utica, NY to Herkimer, NY. Frederick Schweizer, a Utica Alloys employee since 2005 as Vice President of New Business and Vice President of Operations after the acquisition by ELGUA, became responsible for overseeing the operations and activities at Utica in either 2008 or 2009, was aware of associated environmental issues, and knew not to destroy documents concerning PCBs and other incoming contaminants. (JA-368-369, 380). Mr. Schweizer knew that other entities brought

---

[4] While postdating the Memorandum-Decision and Order, ELGUA submitted RI Reports for the Utica Alloys site and OU1 in July and October 2023, respectively.

PCBs there for disposal. He also spoke to the NYSDEC and understood the NYSDEC classified the location to be remediated. (JA-369, 380).

### A. Records from the Utica location

Records were maintained in two different areas. Robert Carbone, ELGUA's Chief Financial Officer at the time, maintained records in a large closet near his office. (JA-370-371). Inventory records, on the other hand, were maintained in a storage area on the first floor across from the inventory office. (JA-371).

The records near Mr. Carbone's office consisted of canceled checks, balance statements, and purchase orders for equipment. (JA-371). Mr. Carbone did not maintain consultant reports, purchase reports or orders for materials, documents related to legal proceedings, or anything related to the contaminants at issue or the environmental conditions. (JA-376). Inventory records on the first floor consisted of, among other things, records of scrap purchases and sales, including purchase orders for material identifying the type and amount/weight of scrap involved, the amount paid for the scrap, the destination of the scrap, and to whom it was sold. (JA-371, 384-386).

When the records were moved from Utica to Herkimer, the records from Mr. Carbone's office were segregated and stored along the north wall of the Herkimer storage room. Inventory records were stored along the west wall of the Herkimer storage room. (JA-373-374). Inventory documents were not destroyed. (JA-378).

Due to lack of space, Mr. Schweizer wanted to remove Mr. Carbone's old files that had no purpose. (JA-375). Before doing so, Mr. Schweizer personally reviewed the contents of each box of records from Mr. Carbone's office. (JA-375). The decision to destroy documents was "probably mine and Bob's [Carbone]" because Mr. Schweizer wanted to get rid of old files that were taking up space. (JA-375). ELGUA's policy was "not to destroy anything" (JA-372, 374) and ELGUA had in place a system to preserve pertinent business and legal records forever, while other records were maintained for three or six years depending on their contents (JA-380). ELGUA did not issue a litigation hold in this action.

Mr. Schweizer knew about the environmental history of the Site and that nothing should be destroyed that concerned environmental issues. (JA-375). Mr. Schweizer understood he was not to destroy environmental records (JA-375-376, 425-427) including those that had to do with PCBs, TCE or other kinds of substances that were environmentally unsafe, investigations in connection therewith, and the NYSDEC. (JA-386-387). He conversed with the NYSDEC and knew not to destroy anything from the NYSDEC. (JA-380). Mr. Schweizer also understood not to destroy documents discussing how PCBs or other hazardous wastes came to be on the site, stating: "if there was any talk about PCBs coming onto the site or any other hazardous material that would have been — that would have been something, I would have segregated out." (JA-380).

14

Mr. Schweizer did not find any environmental records, such as NYSDEC correspondence, information about PCBs or TCEs, or consultant reports in Mr. Carbone's files. Mr. Carbone did not maintain environmental records in his position as CFO. (JA-376). Mr. Schweizer did not identify any environmental documents to be destroyed. (JA-381).

Because Mr. Carbone's files contained financial business records, Mr. Schweizer received guidance from ELGUA's accountants regarding documents to destroy or retain, including tax records, accounting records, correspondence, financial statements, personnel records, and sales records. (JA-375-376, 425-427). The only records Mr. Schweizer identified to be destroyed were from Mr. Carbone's office — cancelled checks, bank statements, equipment purchases, and "stuff like that." (JA-375).

Mr. Schweizer had a method for reviewing and identifying documents for destruction. As he reviewed the boxes from Mr. Carbone's office, he created two piles: a pile to retain and a pile to destroy. (JA-379). After reviewing, Mr. Schweizer signed his name on each box. (JA-376). This occurred over several months when time permitted. (JA-380-381). Mr. Schweizer repeatedly testified that he did not know how many boxes were in the pile identified for destruction. (JA-372, 382-383, 386). Mr. Schweizer confirmed that ConfiData, the vendor that destroyed the

documents, picked up the correct pile of boxes to be destroyed and left the other pile undisturbed. (JA-377).

### B. Records from storage units

After ConfiData destroyed certain of the screened and selected records from Mr. Carbone's office, other boxes of documents were moved from two storage units to Herkimer. (JA-374, 377). Mr. Schweizer reviewed all of those boxes as well. (JA-377).

Mr. Schweizer also segregated these documents into categories of environmental documents and documents that were not environmental documents. Mr. Schweizer signed his name on boxes. Some boxes contained only environmental documents, and other boxes partially contained environmental items that were identified and pulled from boxes. (JA-381). Mr. Schweizer spoke to attorneys involved in this litigation about the review and segregation of environmental documents. (JA-381-382). None of the boxes from the storage units were destroyed. (JA-377-378). In summary, the only documents destroyed came from the closet near Mr. Carbone's office. (JA-377-378).

William Kinsella, an Assistant Comptroller at ELGUA, also testified. Mr. Kinsella gave no reason for destroying documents other than to create needed storage space. (JA-263). Mr. Kinsella never reviewed any documents in the boxes, or even looked in the boxes of documents that were being destroyed. (JA-263). Mr.

Kinsella does not know of the criteria to determine which boxes of documents would be destroyed. (JA-177).

Mr. Kinsella testified that an unidentified person from Germany may have come to the Herkimer location or was involved in connection with the destruction of boxes of documents. (JA-263). While Mr. Kinsella is under this impression, Mr. Schweizer, the person who actually reviewed and identified documents, testified that he is not aware of any person from Germany traveling to Herkimer and determining what documents would be destroyed. (JA-383-384). Likewise, Mr. Alfred W. Bongers, current Head of Internal Audit for ELG Haniel GmbH and former CFO for ELG Utica Alloys International GmbH, testified that no one from Germany went to Herkimer to select documents to be destroyed. (JA-536-537). Acknowledging Mr. Kinsella's testimony, ELGUA performed an internal inquiry to determine if this, in fact, occurred. This inquiry included email searches, calendar search, search of Mr. Bongers' travel records and confirmation of meetings by German individuals at Herkimer. (JA-537-540). The email search consisted of keyword search terms in the company's historical email data storage for the accounts of custodians understood to be involved. Keywords included terms such as "shredding" and "disposal" and custodians included Mr. Kinsella, Nicholas Oliver, Mr. Carbone, Diane Combs and Mr. Schweizer. (JA-544-546). The search resulted in no evidence to corroborate Mr. Kinsella's testimony.

## SUMMARY OF THE ARGUMENT

The District Court erred in concluding that the Universal Waste site and the Utica Alloys site collectively constitute a single CERCLA facility. Both parcels, as bifurcated by the NYSDEC, were and remain subject to different and separate regulatory action. Separate and legally independent administrative orders with different requirements and schedules apply to each site. Cleanup measures to date have targeted different primary contaminants at each site. ELGUA's claims in this litigation are expressly limited to costs incurred at the Universal Waste site in connection with the 2012 and 2015 Consent Orders, which by their terms pertained only to the Universal Waste site. The 1999 Consent Order as well as the 2007 IRMs, on the other hand, addressed conditions at the Utica Alloys site. ELGUA does not seek recovery of those costs in this litigation. Together, these factors weigh in favor of finding two CERCLA facilities.

The District Court also erred in determining ELGUA's CERCLA cost recovery claims are time barred by application of the single-remediation principle. The District Court's decision frustrates CERCLA's regulatory framework and statutory goals designed to protect and preserve the public health and the environment by promoting effective remediation, as the formal remedy selection process has not been completed. Application of the single-remediation principle also could effectively strip ELGUA of its critical CERCLA cost

18

recovery/contribution rights, despite Appellees' statutory responsibility. The District Court's application of the single-remediation principle, because ELGUA had already identified certain Appellees as responsible parties and could have initiated a timely cost recovery claim for the 2007 IRMs, overlooks that ELGUA is not even seeking recovery of those costs and ignores the disproportionate impact on ELGUA.

The District Court's decision also creates an illogical outcome, requiring ELGUA to commence litigation no later than December 2013 (six years after construction of the 2007 IRMs began). In December 2013, NYSDEC had not proposed, published for public comment, or selected a remedy for any on-Site or off-Site location. The RI of the Universal Waste site under the 2015 Consent Order had not yet begun. As such, the nature and scope of any final remedy was unknown, and unknowable, as of 2013. ELGUA should not be compelled to advance a claim covering locations that (i) NYSDEC had yet to select or propose a remedy for, and (ii) ELGUA had not investigated.

The District Court also erred by determining ELGUA's excavation and disposal of contaminated soil and groundwater under the 2007 IRMs constituted remedial action under CERCLA. With no or only limited investigation of large portions of the Site completed (or even commenced), the 2007 IRMs were not part of a remedial plan to clean up the Site, nor were they intended as a permanent,

comprehensive (or final) remedy. Similarly, in targeting contamination after its release and migration from its original source, the 2007 IRMs did not address the true underlying causes of contamination. Moreover, the IRMs addressed "hot spot" locations over a short period of time, also consistent with a removal action.

The District Court abused its discretion by concluding that ELGUA spoliated evidence. The District Court's decision is based upon clearly erroneous factual determinations that result from speculation — the number of documents destroyed and other controverted evidence — rather than the evidence itself. Relevant documents were not destroyed. ELGUA methodically identified and segregated relevant environmental documents from irrelevant business documents that were destroyed. ELGUA did not have the requisite culpable state of mind and did not act with gross negligence, rendering a spoliation finding improper.

## ARGUMENT

### I.      Statement of the Standard of Review.

The standard of review from a summary judgment ruling is *de novo*. *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 84 (2d Cir. 2021). This standard of review applies to argument sections II, III, and IV. The standard of review from the imposition of spoliation sanctions is abuse of discretion. *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007). The appellate court

"accept[s] the district court's factual findings . . . unless they are clearly erroneous." *Id.* This standard of review applies to argument section V.

## II. The Universal Waste site is a CERCLA facility separate from the Utica Alloys site.

The District Court held that the Universal Waste and Utica Alloys sites collectively comprise a single facility under CERCLA. This litigation, however, concerns only the Universal Waste site, a location geographically separate from and subject to altogether different regulatory treatment than the Utica Alloys site. By combining the two sites, the District Court erroneously considered costs incurred at the Utica Alloys site. When removing those costs and only considering costs related to the Universal Waste site, ELGUA's claims are timely. The award of summary judgment was therefore improper.

CERCLA defines "facility" to include any area where a hazardous substance has been "disposed of, or placed, or otherwise come to be located..." 42 U.S.C. 9601(9); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 n. 15 (2d Cir. 1985). Though the definition has been broadly construed in general, parcels "reasonably or naturally divided into multiple parts or functional units" should be considered separate facilities. *Brooklyn Natural Gas Co. v. Exxon Mobil Corp.,* 480 F. Supp. 3d 430, 442 (E.D.N.Y. 2020) (citing *Niagara Mohawk Power Corp. v. Consol. Rail Corp.*, 291 F. Supp. 2d 105, 125 ((N.D.N.Y. 2003)).

Here, several factors support a two-facility conclusion. As a threshold matter, ELGUA's instant claims are expressly limited to the Universal Waste site. *See* First Amended Complaint at ¶¶1, 5, 22, 43, 49, 56, 71, 74. ELGUA has not asserted a claim related to the Utica Alloys site. At the same time, ELGUA only seeks recovery of costs incurred since 2012. Since the 2007 IRMs were completed before 2012, the District Court erred in considering any claim for those costs. It follows that ELGUA's claims, limited to costs incurred beginning in 2012 at the Universal Waste site, are timely.

Beyond this fundamental flaw with Appellees' summary judgment position, the Universal Waste and Utica Alloys sites are reasonably and naturally divisible into separate parts. This is borne out by the sites' disparate regulatory treatment. NYSDEC bifurcated the Site into two geographically distinct areas, and each has proceeded under separate and legally independent regulatory tracks. The Utica Alloys and Universal Waste sites were investigated under their own administrative orders containing different scopes of work performed years apart under completely independent schedules. In particular, the 1999 Consent Order was limited to the Utica Alloys site, while the 2012 and 2015 Consent Orders address conditions only at the Universal Waste site. The Consent Orders contemplate NYSDEC issuing separate RODs for each site. Though not determinative (SPA-43; JA-2502), such regulatory separation lends itself to a two-facility conclusion. *Cf. Cooper Crouse-*

22

*Hinds, LLC v. City of Syracuse,* 568 F. Supp. 3d 205, 234-35 (N.D.N.Y. 2021) (finding that adjacent properties were a single CERCLA facility in part because NYSDEC treated them 'unitarily" subject to joint remedial efforts).

Excavation work undertaken to date at the Utica Alloys and Universal Waste sites has also been decidedly different. The 2007 IRMs at the Utica Alloys site included the removal of PCB-impacted soil (83 tons) as well as more than a six-fold volume of TCE-contaminated soil (527 tons). At the same time, nearly 7,000 gallons of TCE-contaminated groundwater were removed during the 2007 IRMs.

The 2018 IRMs at the Universal Waste site, in contrast, entailed the excavation of some 17,000 tons of soil and berm piles characterized according to its PCB content, unrelated to TCE or other chlorinated constituents. No groundwater was removed during the 2018 IRMs. Stated differently, the 2007 IRMs focused principally on (i.e., were driven by) TCE impacts (soil and groundwater) on the Utica Alloys site, but the 2018 IRMs targeted PCB-contaminated soil (and berm piles) at the Universal Waste site, at umpteen-fold larger volumes.

The Utica Alloys and Universal Waste sites also enjoy separate ownership and operation histories. ELGUA, the Universal Waste site owner after 2008, was the only party to the 2012 and 2015 Consent Orders. Parties to the 1999 Consent Order were Utica Alloys (lessee) and Clearview Acres, Ltd. (owner). *See Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 843 (4th Cir. 1992) (individual

23

facilities where site was subdivided and separate portions were leased out to individual tenants). As noted above, Utica Alloys was formed years before Universal Waste and each had separate corporate charters.

Overall, the Universal Waste and Utica Alloys sites enjoyed regulatory separation, distinct cleanup actions/schedules, and differing ownership/operation histories. These factors make the sites reasonably and naturally divisible into separate CERCLA facilities. As such – and given that ELGUA explicitly restricted its claims to the Universal Waste site – the District Court's consideration of the 2007 IRMs and the Utica Alloys site was improper. Limited to post-2012 costs related to the Universal Waste site, ELGUA's claims are timely.

### III. Application of the single-remediation principle is illogical, unfair and contravenes CERCLA's objectives and remedy selection process.

The District Court erroneously determined ELGUA's cost recovery claims were barred by application of the single-remediation principle. The single-remediation principle was first recognized in the Second Circuit in *New York State Elec. and Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212 (2d Cir. 2014). Reasoning that the "very nature of a remedial action is to *permanently* remediate hazardous waste" and achieve "a final, once-and-for-all cleanup," the Court concluded there can be only one remedial action at a site. *Id.* at 236 (emphasis in original). In *MPM Silicones, LLC v. Union Carbide Corp.*, the Court revisited and clarified the single-

24

remediation principle applies "when a remediation is undertaken under a remediation plan based on *full disclosure of the known problem.*" 966 F. 3d 200, 229 (2d Cir. 2020) (emphasis added). Examples where application of the principle may be "inappropriate" include subsequent remediation undertaken to remediate a problem that did not exist at the time of the prior remedial act, discovery of previously unsuspected contamination unrelated to and perhaps distant from previously remediated contamination, or where a party would be unfairly precluded from bringing suit. *Id*. at 227.

*MPM* further clarified that the single-remediation principle should not apply where "the circumstances of a case would render it *illogical* and *unfair*, and would *defeat* the statutory design or objectives." *Id*. at 226-227 (emphasis in original). Such examples include a subsequent remediation that "address[es] a different set of problems — *e.g.,* problems that were non-existent, unknown, elsewhere or undisclosed to the regulators and unrevealed in an earlier remediation plan." *Id*. at 230.

The District Court held that the 2007 IRMs constituted a remedial action and that, under the single-remediation principle, the applicable cost recovery limitations period, measured six years from initiation of construction, expired in December 2013 (42 U.S.C. § 9613(g)(2)(B)). Application of the single-remediation principle in these circumstances is both illogical and unfair, while also contravening CERCLA

statutory objectives and the regulatory framework for cleaning up contaminated properties.

      A.    <u>The District Court's decision frustrates the regulatory process designed to promote effective remediation.</u>

The 1999 Consent Order directs ELGUA to perform an RI/FS in accordance with the National Contingency Plan ("NCP") (40 CFR § 300.430). (JA-1166-1167). The NCP sets forth a sequential, logical pathway for remedy selection at contaminated sites. Generally, the pathway entails site investigation, identification and evaluation of remedial alternatives, identification of a proposed remedy, public review/comment, and remedy selection. 40 C.F.R. § 300.430.*; see also MPM*, 966 F.3d at 229-30. To prevail under CERCLA, costs incurred by a private party must be consistent with the NCP. 42 U.S.C. § 9607(a)(1)-(4)(B).

An RI/FS is designed to assess site conditions and evaluate alternatives as necessary to select a remedy. 40 CFR § 300.430(a)(2). The process begins with collecting sufficient data during an RI to adequately characterize a site and develop and evaluate effective remedial alternatives. *Id*. at 430((d)(1). Once viable remedial options are identified, they are subject to rigorous analysis using nine specified statutory/regulatory criteria. *Id.* at 430(e)(2)(9)(iii). Where, as here, prior removal activities have already occurred, a no-action alternative must be developed. *Id.* at 430(e)(6).

Selection of a remedial action is a two-step process with the lead agency (here, NYSDEC), in conjunction with the support agency (USEPA), using the RI/FS to develop and present to the public a preferred alternative (proposed plan) for review and comment. *Id*. at 430(f)(1)(ii), (2). In the second step, the lead agency reviews the public comments and consults with the supporting agency before selecting the final remedy from the alternatives evaluated and documenting the decision in a record of decision ("ROD"). *Id*. at 430(f)(1)(ii), (4)-(5). Detailed requirements are associated with each step of the RI/FS through issuance of the ROD. *See generally id*. at 430.

Here, while the Site has been the subject of multiple investigations, a comprehensive RI/FS has not been completed. RI reports for OU1 and the Utica Alloys site were recently submitted (see footnote 4, above), though investigation/study of OU3, and portions of the Mohawk River (OU2), is ongoing. (*See generally* JA-1779). No feasibility study for any location has been completed, but an FS report for OU1 is expected shortly. NYSDEC has performed a remedial investigation of OU2 (presented in a 2019 report), (JA-1794), though no feasibility study has been completed. As no RI/FS has yet to be completed, NYSDEC has not issued a ROD for any location, nor identified or proposed a final remedy for public comment. Simply put, there is neither full disclosure of, nor a remediation plan addressing, Site (or off-Site) conditions. *MPM*, 966 F.3d at 229. Nor, of course, is

a "final, once-and-for-all cleanup," identified or in place. *NYSEG*, 766 F.3d at 236. Far less was known in 2013, ELGUA's deadline for commencing litigation under the District Court's analysis.

Applying the single-remediation principle, with so many of the critical features of the remedy selection process unfulfilled, is directly at odds with the detailed process outlined in the NCP and embodied in both the 1999 (Utica Alloy site) and 2015 (Universal Waste site) Consent Orders. Sweeping OU2, OU3 or any other off-Site area into the single-remediation principle would further undermine that process. In contrast, awaiting completion of a full investigation/assessment of conditions, thorough evaluation of remedial alternatives, a preferred remedial plan (and public review/comment), and formal remedy selection permits the regulatory process to proceed as designed and achieves the statutory goals of CERCLA.

The shortcomings of applying the single-remediation principle before the remedy selection process set forth in the NCP is completed are also highlighted by the geographic differences between the various parcels. The 2007 IRM excavation work was limited to small, discrete areas of the 1.5-acre Utica Alloys site (JA-1423), though Appellees maintain that some of the work carried over onto the adjoining Universal Waste site. (SPA-17-18; JA-2476-2477; footnote 7 below). Contaminants present at the OU2 and OU3 areas, on the other hand, were/are located "elsewhere." *MPM*, 966 F.3d at 230. When compared to those locations, the Utica

Alloys site represents less than 7% of the Site acreage (1.5/23) and barely 2% of the combined OU1, OU2 and OU3 acreage, or 1.5/74 (23+40+11) — with the actual IRM excavation areas constituting even smaller percentages. When contrasted with the 2018 IRMs, the soil tonnage excavated in 2007 (610.7) represents less than 4% of the volume removed in 2018 (16,941), or 3.6% (610.7/16,941) — further reinforcing the minimal scope of the 2007 work relative to what occurred in 2018 and more generally to the expansive size of the off-Site areas. The narrowly-limited 2007 IRMs were not part of a broader, on- or off-Site remedy. (JA-1408; JA-1316).

By comparison, once selected, a remedy for the Utica Alloys site will comprehensively address that area, and a remedy for the Universal Waste site will comprehensively address that area. And an off-Site remedy will address off-Site conditions, not the soil or groundwater removed during the 2007 IRMs (or the berm/debris piles removed during the 2018 IRMs). (JA-1779). The single-remediation principle should not control where, as here, it would thwart the orderly remedy-selection process outlined in the NCP.

   B.   Application of the single-remediation principle is unfair to ELGUA in this instance.

The District Court found that application of the single-remediation principle would not be unfair because nothing precluded ELGUA, having already identified certain Appellees as responsible parties, from initiating a cost recovery claim for the 2007 IRMs before December 2013. (SPA-51; JA-2510). Initially, any claim of

unfairness overlooks that ELGUA is not even *seeking* recovery of costs to implement the 2007 IRMs, or any other prior costs, as described in the First Amended Complaint, ¶1 (limiting ELGUA's claims to costs incurred beginning in 2012). Certainly, Appellees cannot claim prejudice by ELGUA's decision to *exclude* claims for those costs. Likewise, when directing the fairness inquiry on post-2012 costs actually at issue, Appellees can show no prejudice there either, with litigation commenced well within the statute of limitations applicable to the 2012 Consent Order (terminated in 2016) and the 2015 Consent Order (ongoing). *See* 42 U.S.C. § 9613(g)(2)(A) (cost recovery limitations period expires three years after completion of removal action).

Crucially, application of the single-remediation principle could effectively strip ELGUA of its CERCLA cost recovery/contribution rights as to all on-Site and (according to Appellees) potentially off-Site costs. This is so even though ELGUA remains the only party to expend resources to address contaminated conditions. Appellees, by comparison, have contributed nothing. Viewed in this light, the draconian impact that application of the single-remediation principle imposes on ELGUA far outweighs any unfairness attendant to Appellees having to await a later suit. *MPM*, 966 F.3d at 230, n. 41 (single-remediation principle not intended to control where it would cause unfairness).

30

Appellees revealed their desire to employ the single-remediation principle to escape any responsibility for the Site or off-Site conditions after the District Court granted summary judgment. Specifically, in response to ELGUA's Motion to Clarify, Appellees took the position the Memorandum-Decision Order also operates to preclude ELGUA from asserting any off-Site claims. (JA-2608-2613 *in passim*; JA-2516-2540 (discussion during judicial conference of Appellees' proposed inclusion of off-Site areas in settlement release)). Appellees cannot parlay ELGUA's decision to forego recovery of its 2007 IRM costs into the revocation of its statutory rights to recover other costs for anything even tangentially related to the subject of the 2007 IRMs, while at the same time potentially wiping the slate clean on their statutory liability to ELGUA.

The unfairness resulting from application of the single-remediation principle disproportionately falls on ELGUA and allows Appellees to avoid any responsibility for cleanup activities/costs. As this Court made clear, the principle should not apply when it would cause unfairness. *MPM, supra.* The unfairness here is only exacerbated because its greatest impact falls on the one party who has actually contributed to cleanup activities.

C. <u>The District Court's application of the single-remediation principle is illogical in this case.</u>

Under the District Court's analysis, in order to timely bring a CERCLA claim, ELGUA needed to commence litigation no later than December 2013 (six years after

31

commencing construction of the 2007 IRMs). As of that date, NYSDEC had not proposed, published for public comment, or selected a remedy for any location. The results of ELGUA's limited investigation under the 2012 Consent Order were reported in 2016 and the broader RI performed under the 2015 Consent Order had not yet begun. As such, the nature and scope of any final on-Site remedy was unknown when, under the District Court's analysis, the limitations period expired.

The rationale for not applying the single-remediation principle here applies *a fortiori* to off-Site locations. ELGUA did not commence a remedial investigation of the 11-acre OU3 until after the 2015 Consent Order was entered. As for the 40-acre OU2, NYSDEC (not ELGUA) investigated that area and did not report the results until 2019. (JA-1794). Neither OU2 nor OU3 had been given its operable unit designation at the time the statute of limitations expired under the District Court's analysis. (JA-1633-1634). This situation may be compared to the third location in *NYSEG*, discussed below, where, although the single–remediation principle applied, the regulatory agency had defined the subsequently remediated area as an operable unit and an investigation of that area had commenced before the limitations period expired. *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 478 (N.D.N.Y. 2011) (*cited with approval in MPM*, 966 F.3d at 224).

With no RI/FS completed as of 2013 (much less a remedy proposed or issued), whether remediation of off-Site areas would be necessary and, if so, what that

remediation would entail remained uncertain. So, too, were the types and quantities of contaminants that necessitated (or drove) any such remedy. These uncertainties further inhibited the ability to identify each of the various sources responsible for those wastes, to wit, the litigation targets. It defies logic under these circumstances to require ELGUA to advance a claim in 2013 covering those locations, for which ELGUA has denied any remediation liability. *MPM*, 966 F.3d at 224 (contrasting "altogether reasonable" use of the single-remediation principle in "conventional circumstances" as opposed to where it would "make little sense").

D.    <u>The District Court's application of the single-remediation principle undermines CERCLA's statutory objectives.</u>

Courts consistently construe CERCLA liberally to advance its "dual goals of cleaning up hazardous waste and holding polluters responsible for their actions." *See NYSEG*, 766 F.3d at 220 (collecting cases); *MPM*, 966 F.3d at 227-28 (referencing the importance of "placing the cost of . . . cleanup on those responsible for creating or maintaining the hazardous condition" and describing statutory cost recovery as an "essential motivator") (citations omitted); *see also Key Tronic Corp. v. United States*, 511 U.S. 809, 819 n. 13 (1994) ("CERCLA is designed to encourage private parties to assume the financial responsibility of cleanup by allowing them to seek cost recovery from others"). For these reasons, *MPM* cautioned against the "wholly unjustified immunity" that results from the "overbroad application" of the single-remediation principle. 966 F.3d at 228.

Applying the single-remediation principle here undermines these important statutory goals. Assuming, for example, a comprehensive RI/FS is completed, and a final remedy is proposed, selected and, in turn, implemented, application of the single-remediation principle to preclude ELG from seeking recovery of those costs would discourage, not encourage, private party cleanups.[5] Appellees, empowered with the knowledge that ELGUA would have no recourse to pursue them for costs, would have no incentive to step forward and assist with cleanup. Having already ignored ELGUA's — and NYSDEC's — invitations to participate in past work activities, invoking the single-remediation principle strips ELGUA of its future cost recovery/contribution rights and all but guarantees that Appellees remain on the sidelines. Left as potentially the only performing party, application of the single-remediation principle would only dissuade, not incentivize, ELGUA and others similarly situated, to step forward and take on the cleanup itself, frustrating fundamental statutory goals of CERCLA.

In the same vein, applying the single-remediation principle to protect Appellees from future cost claims defeats CERCLA's goal of ensuring that polluters

---

[5] Apart from depriving ELGUA of its cost recovery rights, application of the single-remediation principle could prevent ELGUA from asserting statutory contribution claims against other responsible parties should (i) NYSDEC (or some other person who has incurred recoverable costs) bring claims against ELGUA, 42 U.S.C. § 9613(f)(1), or (ii) ELGUA enter a qualifying settlement under 42 U.S.C. § 9613(f)(3)(B).

pay. This is especially troubling here given Appellees' across-the-board unwillingness to participate. Moreover, in the case of the Mohawk River, undoubtedly innumerable sources from this industry-rich area contributed to current conditions. Cutting off cost recovery rights before those sources have even been identified ensures that those sources/parties *don't* pay their fair share. At the same time, applying the single-remediation principle to necessitate premature litigation (e.g., before an RI/FS is completed and a remedy identified) only wastes resources, also contrary to statutory objectives. *MPM*, 966 F.3d at 226-7 (holding *NYSEG* and the single remediation principle are not "intended . . . to control if the circumstances of a case would render it *illogical* and *unfair*, and would *defeat* the statutory design or objectives" (emphasis in original)); *B.F. Goodrich v. Betkoski*, 99 F.3d 505 (2d Cir. 1996) (noting the purposes of CERCLA include "facilitating efficient responses to environmental harm, holding responsible parties liable for the costs of the cleanup . . . and encouraging settlements that reduce the inefficient expenditure of public funds on lengthy litigation" (citation omitted)).

Employing the single-remediation principle to eradicate ELGUA's cost recovery/contribution rights violates CERCLA's twin primary objectives and triggers unnecessary litigation. Application of the single-remediation principle is not appropriate in these circumstances, particularly when used to cut off ELGUA's statutory cost recovery/contribution rights related to off-Site locations. Doing so

contravenes CERCLA's well-established statutory goals and distinct remedy-selection process, defies logic, and imposes disproportionate hardship on ELGUA.

## IV.    The 2007 IRMs did not constitute a CERCLA remedial action.

The 2007 IRMs were to remove limited soils containing PCBs from certain identified areas, remove soils above the water table in the vicinity of a former AST and monitor groundwater quality in the vicinity of the tank to assess groundwater quality changes.  Section 107(a)(1)-(4)(B) of CERCLA authorizes a private party to recover "necessary costs of response incurred … consistent with the national contingency plan…"  Although the statute does not expressly define "costs of response," it does define "response" to include "remove, removal, remedy, and remedial action…" 42 U.S.C. § 9601(25).  Accordingly, a private party may "seek reimbursement for all removal or remedial costs associated with the hazardous materials on the property..." *Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 120-21 (2d Cir. 2010).  The definition of removal appears in 42 U.S.C. § 9601(23) and the definition of remedy/remedial action appears in 42 U.S.C. § 9601(24).

As stated in *MPM*, the statutory definitions do not provide "clear insight as to the boundary" between removals and remediations and "overlap substantially," with certain measures capable of being classified as either action. 966 F.3d at 219. As defined under New York law, an IRM encompasses elements of both removal and

remedial actions and may qualify as either. N.Y. Comp. Codes R & Regs. Tit. 6, § 375-1.2(ab); *NYSEG*, 766 F.3d at 234-35 ("IRMs can either be removal or remedial actions"). Whether a cleanup activity constitutes a CERCLA "removal action" or a "remedial action" is a question of law. *Id.* at 230 (citations omitted).

The District Court provided the following rationale in determining the 2007 IRMs constituted a remedial action: (1) the excavation/disposal of PCB-contaminated soil and groundwater was "consistent with a permanent remedy" and therefore fell within the statutory definition of remedial action (42 U.S.C. § 9601(24)); (2) the excavation activities were aimed at eliminating the source of the contamination, not merely mitigating its deleterious effects at the endpoint; and (3) the soil excavation and disposal were not conducted to address an "imminent threat or emergency situation." (SPA-45-48; JA-2504-2507). Rather, PCB contamination was first discovered in 1977 and excavation/disposal only followed years of planning, investigation and coordination with NYSDEC. (SPA—45-47; JA-2504-2506). As explained below, the underlying regulatory and factual circumstances of this litigation do not support the Court's determination that the IRMs qualify as a remedial action. Instead, the proper conclusion, as a matter of law, is that the 2007 IRMs constitute removal action.[6]

_____

[6] ELGUA acknowledges at various points characterizing the 2007 IRMs as remedial in nature and, elsewhere, asserting that remedial work began (or may have) as early

A.   <u>The 2007 IRMs lack the hallmarks of permanent CERCLA remedial action.</u>

CERCLA defines "remedy" or "remedial action" to mean "those actions consistent with permanent remedy…" 42 U.S.C. § 9601(24). Removal actions, however, may likewise be consistent with a permanent remedy. Both removal and remedial actions may include digging up and extracting soil impacted by hazardous substances. *Compare* 42 U.S.C. § 9601(23) (defining removal action to include the "*removal* of hazardous substances") with 42 U.S.C. 9601(24) (defining "remedial action" to include "dredging *or excavations*…"). *Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415, 1419 (8th Cir. 1990) ("Any distinction between 'excavation' of contaminated soils and 'removal' of contaminated soils is one that eludes us."). *Accord Yankee Gas Servs. Co. v. UGI Utils., Inc.*, 616 F. Supp. 2d 228, 274 (D. Conn. 2009) (rejecting idea that removal of contaminated soil would be "inconsistent with a permanent remedy").

Case law from this Circuit supports the conclusion that removal of contaminated soil, as occurred in this case, can properly by considered a removal action. In *NYSEG*, this Court considered whether cleanup measures involving the

---

as 2015. As the District Court noted, however, assertions of this nature are not dispositive of the remedial/removal question. (SPA-48; JA-2507) (*citing New York v. Next Millennium Realty, LLC*, 732 F.3d 117, 130 (2d Cir. 2013) ("The use of the word by itself does not render an action 'remedial' for purposes of the statute of limitations."))

excavation of coal tar waste/soil at three former manufactured gas plants constituted removal (or remedial) action. At the first site, this Court held, *inter alia*, that excavation of the contaminated soil that had migrated to an adjacent river was part of a removal action that preceded a formal remedy selected some 20 plus years later. 766 F.3d at 232-233. Referencing the district court opinion, this Court stressed the earlier work was a discrete project to prevent coal tar from reaching (and to remove it from) the river and neither NYSDEC nor the performing party (NYSEG) envisioned the project as encompassing a "CERCLA-quality clean-up of *the entire . . . site*." *Id*. at 233 (emphasis in original). *See also United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1247 (9th Cir. 2005) (cleanup activity deemed removal action where it did not "fully eliminate the public health threat or amount to a full-blown remediation"). Here, as at the *NYSEG* plant, the 2007 IRMs addressed only limited, discrete areas and were never envisioned as a comprehensive Site-wide remedy.

The second site in *NYSEG* involved a three-phase IRM comprised in sequence of targeted soil excavation, thermal treatment of the excavated soil, and removal of the top layer of soil from the entire site. In holding that the three phases were part of one remedial action, the Court noted that NYSEG stipulated that the IRM was a single action comprised of three phases, EPA determined the site cleanup was only a medium priority, applicable NYSDEC guidance provided that IRMs may be either removal or remedial, and phase three was part of a larger remedial action that began

39

with the earlier phases. *Id*. at 234-35. In this case, in contrast, ELGUA did not stipulate that the 2007 IRMs was part of a single, larger action. No formal investigation of OU2-3 had even begun as of 2007, and at no time has ELGUA addressed OU2 (NYSDEC has investigated).

At the third site, NYSEG removed and thermally destroyed coal tar contaminated soil pursuant to a NYSDEC-issued ROD (referred to as OU1). After discovering more coal tar contamination that had discharged via a pipe to the adjacent river, NYSDEC later ordered NYSEG to remove the pipe and contaminated river sediments (referred to as OU2). In the ensuing cost recovery action, this Court held that the work at OU2 was part of the same remedial action that began with OU1 (performed some 8-9 years earlier) and therefore time barred. The Court stressed that the OU2 work was designed to permanently eliminate the coal tar contamination and that there can be only one remedial action at a site, *i.e.*, OU1. *Id.* at 235-36. The instant litigation is easily distinguishable, given that NYSDEC has not issued a ROD to remediate *any* area and the 2007 IRMs were never intended as a permanent, comprehensive (or final) remedy.

Other courts have also found removal/excavation of soil to be removal actions. *W.R. Grace & Co.*, 429 F.3d at 1237 (excavation of impacted soil at a local elementary school); *Gen. Elec. Co.*, 920 F.2d at 1419 (excavation of soil and buried drums "is undoubtedly a 'removal of hazardous substances from the environment'").

While the removal of contaminated soil was deemed remedial in *Yankee Gas Servs*., 616 F. Supp.2d at 274, and *Cytec Indus. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821 (S.D. Ohio 2002), both of those actions were accompanied by additional measures expressly included in the statutory definition of remedial action. *See Yankee Gas Servs*., 616 F. Supp. 2d at 274 (installation of clay surface cap) and *Cytec Indus.*, 232 F. Supp. 2d at 838 (soil "recycled for reuse" as cement). *See also NYSEG*, 766 F.3d at 235 (removed soil subject to thermal treatment). Likewise, use of a crane to excavate and spread soil/cover on-site in preparation for a landfill's formal closure in *Schaefer v. Town of Victor*, 457 F.3d 188 (2d Cir. 2006), constituted an action "consistent with permanent remedy" under the statutory definition of remedial action (defined to include clay cover). The 2007 IRMs, in contrast to the above decisions, did not involve installation of a cover or recycling or treatment of excavated soil.

In its analysis of the "consistency with permanent remedy" question, the District Court also considered the potential relevance of a remedial plan. (SPA-45-46; JA-2504-2505). This Court has resisted a bright-line test that ties initiation of on-site construction for purposes of 42 U.S.C. §9613(g)(2)(b) to the approval of a final remedial action plan. *Schaefer*, 457 F.3d at 207-09 (rejecting the argument that a remedial action can only take place after approval of a final remediation plan). Nevertheless, ELGUA implemented the 2007 IRMs with no final remedial plan in sight and as part of the 1999 Consent Order principally designed to investigate and,

in turn, determine that very plan (after conclusion of RI/FS and public comment period, NYSDEC "shall select a final remedial alternative"). (JA-1167).

Completion of the RI/FS process is an integral building block of the remedy selection process. *See MPM*, 966 F.3d at 220 (citing 40 CFR § 300.430(a)(1)(ii)(C) ("Unlike removals, remediations generally presuppose full disclosure has been made to the regulator of the 'scope and complexity of the site problems being addressed'")). That disclosure ensures that the remedial action, once selected, will serve as a "final, once-and-for-all cleanup of a site". *NYSEG*, 766 F.3d at 236. While a final plan may not be "dispositive" of the removal/remedial question, its absence here, coupled with the ongoing implementation of an RI/FS designed to identify such a plan, only fortifies the conclusion that the IRMs fail to qualify as a remedial action. (SPA-45; JA-2504) (citing *Schaefer*, 457 F.3d at 207-09); *accord New York v. P.A. Indus.*, No. 17-CV-1146 (DRH)(SIL), 2021 U.S. Dist. LEXIS 261381, at *36 (E.D.N.Y. July 14, 2021) (citing absence of RI/FS report as plausible support for disputed work constituting removal action).

Section 121 of CERCLA, 42 U.S.C. § 9621, which applies to the RI/FS performed under the 1999 Consent Order, (JA-1166-167), also supports this conclusion. Section 121(a) of CERCLA, entitled "*Selection of remedial action,*" directs [EPA] to "select appropriate remedial actions" that, *inter alia*, "provide for cost-effective response" that "take[s] into account . . . total short- and long-term costs

42

. . . including the costs of operation and maintenance." *See also* 40 CFR §300.430(f)(ii)(D) (requiring further comparative evaluation of the cost-effectiveness requirement).

Elsewhere, Section 121(b)(1) of CERCLA provides that "remedial actions" involving "treatment" of hazardous substances that "permanently and significantly reduces [their] volume, toxicity or mobility" are to be "preferred" over non-treatment alternatives. Moreover, the "offsite" transport and disposal of hazardous substances without such treatment, as occurred in this case, "should be the least favored" alternative remedial action. This provision also states that EPA "shall" conduct an assessment of permanent solutions and alternative treatment/resource recovery technologies, while taking into account specific, detailed criteria, before a remedial action is selected. *Id.*

Despite these clear statutory/regulatory directives underlying a remedial action, the record presented on summary judgment does not reflect, *inter alia*, that NYSDEC (or USEPA) determined or conducted the specified analysis/comparative evaluation of whether the 2007 IRMs represented a cost-effective response. Nor is there a finding/explanation for why NYSDEC approved the "least favored" alternative (off-site disposal without the permanent reduction of volume, toxicity or mobility). The absence of such evidence is also consistent with the conclusion that the 2007 IRMs fall outside the definition of a remedial action.

B.    The 2007 IRMs targeted specific contaminants after they were released into the environment and migrated from the original source and did not eliminate the contamination.

The District Court also concluded that the 2007 IRMs were aimed at eliminating the source of the contamination, particularly seven previously identified "hot spot" areas of PCB-contaminated soil located in an outside storage area of the Utica Alloys site.  (SPA-46-47; JA-2505-2506).  In addition, the IRMs addressed TCE-contaminated soil and the underlying groundwater associated with a former AST on the Utica Alloys site.  (JA-1408).

ELGUA observes that the original source of these contaminants were incoming PCB-containing transformers/electrical equipment and the AST. The IRMs did not involve removal of the transformers or the tank, just the soil/groundwater to which their contents had discharged/migrated. (JA-1410-1413). In fact, PCB-containing transformers and capacitors were removed and shipped off-site in 1979, some *twenty-eight* years earlier, (JA-925-943), with PCBs subsequently detected in a multitude of locations.  (JA-1423).  Similarly, the number of TCE excavation areas (three), and the spatial distances between them, as well as TCE's presence in underlying groundwater, all demonstrate migration well beyond the vicinity of the AST.  (JA-1424).  In preventing further migration of the PCBs and VOCs that had already impacted soil and groundwater, the 2007 IRMs were thus consistent with a removal action.  *See MPM*, 966 F.3d at 220, *citing NYSEG*, 766

44

F.3d at 233 (drawing distinction between a remediation to address the underlying source of contamination and a removal to prevent a contaminant that had already migrated from its source from further migration).

Likewise, in targeting "hot spot" locations, the 2007 IRMs did not eradicate PCB and TCE contamination. Indeed, both constituents have been detected throughout much of the Site, where they remain. (JA-1806-1815). In this context, the IRMs "minimized or mitigated" rather than "permanently eliminated" PCB and VOC contamination, also consistent with a removal action. *See New York v. Next Millennium Realty, LLC*, 732 F.3d 117, 127 (2d Cir. 2013); *NYSEG*, 766 F.3d at 233; *W.R. Grace & Co.*, 429 F.3d at 1247(finding cleanup activity to be removal action where it did not "fully eliminate the public health threat or amount to a full-blown remediation").

     C.     <u>The NYSDEC determined conditions giving rise to the IRMs posed a significant threat to public health/environment and the IRMs were implemented in a short time.</u>

In determining that the 2007 IRMs did not address an "imminent threat or emergency situation" (SPA-47-48; JA-2506-2507), the District Court noted that remedial actions are generally designed as comprehensive solutions, (SPA-47; JA-2506), while removal actions address imminent threats that are often planned and implemented "relatively quickly." (SPA-39-40; JA-2498-2499)*; see also MPM*, 966

F.3d at 219 ("key distinction" between removal and remedial actions is "immediacy and comprehensiveness").

The District Court also pointed out that at various times leading up to the 1999 Consent Order, ELGUA asserted contaminants present on the Utica Alloys site did not constitute an immediate health hazard or pose a serious environmental problem. For its part, NYSDEC agreed (i) in 1980, the Site did not pose either an "imminent health hazard" to water supplies or the surrounding area, and (ii) in 1991, the Site did not pose an "imminent threat." (JA-946; JA-1044). As of the 1999 Consent Order, however, NYSDEC had determined conditions giving rise to the Order and associated 2007 IRMs *did* pose a significant risk. In particular, the Order memorializes NYSDEC's statutory determination that the Utica Alloys site is an inactive hazardous waste disposal site, as defined at ECL 27-1301.2, that presented a "*significant threat* to the public health or environment." (JA-1165). Previous sampling revealed that concentrations of PCBs and TCE exceeded NYSDEC recommended cleanup criteria. (JA-1315-1317).

As for the duration of the Site work, investigatory measures performed under the 1999 Consent Order undeniably took time. Implementation of the IRMs themselves, however, did not take long at all. The Interim Remedial Measures Report summarizing the IRMs documents the following: excavation and associated backfilling of both the PCB- and TCE-contaminated soils spanned a total of 15 days

to complete. (JA-1410). Thus, the 2007 excavation activities did in fact occur "relatively quickly," consistent with a removal action. *MPM*, 966 F.3d at 214-15, 220 (removal actions are "typically short-term cleanup arrangements.")

Putting aside the brief period it took to implement the IRMs, CERCLA removal activities can be time-consuming. This includes remedial investigation and feasibility studies, which, by definition, generally fall within the statutory purview of removal (42 U.S.C. §9601(23)). *Razore v. Tulalip Tribes of Washington*, 66 F.3d 236, 239 (9th Cir. 1995) (RI/FS satisfies statutory definition of removal action as an action "necessary to monitor, assess, and evaluate [a] release…"); *Kelly v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 840 (6th Cir. 1994) ("The courts, and the parties here, agree than an RI/FS action is a type of removal activity."); *South Macomb Disposal Auth. v. EPA*, 681 F. Supp. 1244, 1246 (E.D. Mich. 1988) ("it is clear . . . that a RI/FS taken by the EPA is a 'removal action' within the meaning of the statute"). By design, an RI/FS is typically anything *but* short-lived, requiring a detailed investigation and evaluation of potential remedial options. That was the case here.

It follows that removal actions may normally, but need not, be of an emergent, short-term nature. Excavation of targeted "hot spot" areas constituting a "significant threat" can be completed in only a matter of days, but an RI/FS to investigate and

assess a threat can take years to complete. Both actions qualify as removal actions under CERCLA.

In a similar vein, while ELGUA removed soil/groundwater in implementing the 2007 IRMs, those efforts were far from "comprehensive." *MPM*, 966 F.3d at 219. Significantly, that work addressed discrete pockets of PCB- and VOC-contaminated areas on the 1.5-acre Utica Alloys site only.[7] Additional work followed and continues today. The 2015 Consent Order, for example, addresses some off-Site areas that had not been studied/addressed previously. (JA-1633-1634). The debris piles and berm removed in 2018 were located on the Universal Waste site, not the Utica Alloys site. (JA-1710; JA-1724). The expanded range of chemicals of concern addressed under the 2015 Consent Order include "emerging contaminants" such as "PFAS" (the so-called "forever chemicals"), which NYSDEC required ELGUA to begin sampling in 2016. (JA-1795). Nor, of course, has NYSDEC yet to even propose a final remedy. The 2007 IRMs did not represent a comprehensive (or permanent or final) solution to Site-wide contamination, also in contrast to a remedial action. *NYSEG*, 76 F.3d at 233.

---

[7] Appellees contend some portion of the IRMs actually took place on the Universal Waste site, an argument the District Court did not address. (SPA-45; JA-2504). What is not, and cannot be, disputed, however, is that the excavation work occurred on a very small area relative to the overall Site and off-Site areas at a time when no remedy was in place nor any expectation that the work constituted a full cleanup.

In summary, the 2007 IRMs (*i.e.*, the reputed remedial action here) (i) occurred following a regulatory finding of a "significant threat" and chemical concentrations exceeding NYSDEC recommended cleanup criteria; (ii) entailed excavating/removing contaminated soil/groundwater (deemed hazardous waste), activities which by definition can constitute removal (or remedial) action; (iii) addressed a very small portion of the Site; (iv) were completed in little more than two weeks; (v) took place in the absence of a proposed or final remedial plan under an administrative order whose primary goal was to develop and implement an RI/FS to determine such a plan; and (vi) met few of the requisite statutory/regulatory requirements for a CERCLA remedial action. Each of these factors is consistent with a removal action and, combined, did not achieve a comprehensive solution contemplated by a remedial action.

## V. The District Court abused its discretion by determining ELGUA spoliated evidence because the factual underpinnings for that determination are based upon speculation and controverted evidence that ELGUA knowingly destroyed relevant documents.

The District Court's determination that ELGUA spoliated evidence constitutes an abuse of discretion and rests on clearly erroneous factual determinations. Spoliation occurs when evidence relevant to pending or reasonably foreseeable litigation is destroyed or significantly altered. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). A party seeking sanctions based upon spoliation must prove, by a preponderance of the evidence: "(1) that the party having

control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018); *Pizzella v. Liberty Gas Station & Convenience Store, LLC*, 410 F. Supp. 3d 425, 431 (N.D.N.Y. 2019) (failure to prove any element warrants dismissal).

Speculative or controverted proof that missing evidence would have been exculpatory or otherwise relevant is not sufficient to sustain a finding of spoliation or sanctions. *Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 711 (S.D.N.Y. 2017), *overruling objections* 2017 WL 3172715 (S.D.N.Y. 2017), *aff'd* 795 Fed. Appx. 34 (2d Cir 2019); *Khaldei v. Kaspiev*, 961 F. Supp. 2d 564, 570 (S.D.N.Y 2013) *aff'd* 961 F. Supp. 2d 572 (S.D.N.Y. 2013) (argument that actual loss of relevant evidence is pure speculation and insufficient to sustain a motion for sanctions).

The District Court concluded that (1) ELGUA had a duty prior to March 2014 to preserve evidence relevant to possible future litigation among the parties (SPA-29; JA-2488); (2) ELGUA's obligation to preserve evidence encompassed the documents that were destroyed in March 2014 (SPA-30; JA-2489); (3) ELGUA's failure to preserve evidence constituted gross negligence (SPA-32; JA-2491); and (4) there is sufficient evidence from which a reasonable factfinder could conclude

that the destroyed documents would be relevant and favorable to Appellees (SPA-33; JA-2492). Each conclusion is without merit and based upon speculation or controverted evidence.

> A. The District Court's conclusion that ELGUA's obligation to preserve evidence encompassed the documents destroyed in March 2014 is based upon supposition and speculation.

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). Thus, two inquiries are to be considered: when the obligation to preserve attaches and what evidence is to be preserved. *See also Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). If the evidence is not relevant, there is no duty to preserve.

The crux[8] of the District Court's analysis is that "the sheer volume of paper destroyed in March 2014 strongly suggests that [ELGUA] destroyed more than

---

[8] The District Court determined that ELGUA had an obligation to preserve the documents removed from Herkimer on March 20, 2014. Litigation at that time, however, was not anticipated. Reclassification of the Universal Waste site was unresolved. On February 23, 2015, ELGUA sent a letter to Appellees National Grid and Special Metals Corporation in a good faith effort to "develop a framework and provide resources to facilitate the identification of additional [responsible parties] for the Site." (JA-673). ELGUA was seeking "to achieve an equitable approach to share past and future Site costs . . ." (JA-674). ELGUA only pursued litigation on December 22, 2016, after the parties failed to come to an equitable agreement on shared costs. While this reflects that ELGUA expected to avoid litigation and,

simply 'cancelled checks, bank statements, checks and balances, equipment purchase orders, and other miscellaneous bookkeeping materials.'" (SPA-30; JA-2491). The District Court concluded it was "exceedingly likely that the destroyed documents were not merely the type of 'Accounting Records' described by [ELGUA]," (SPA-30; JA-2491) relying on nothing more than the sheer volume of documents destroyed. The District Court disregards the contrary evidence of record provided by the only person, Mr. Schweizer, who reviewed the documents and unequivocally testified the documents identified for destruction did not contain relevant environmental information, but rather cancelled checks, bank statements, checks and balances, equipment purchase orders and bookkeeping materials. (JA-371, 375-376). The District Court also fails to appreciate that ELGUA acquired documents related to at least six predecessor entities following their purchase and merger into ELGUA. (JA-765-832; JA-833-838). The District Court assumes that the volume of paper destroyed, over 23,000 pounds, proves that more than cancelled checks, bank statements, checks and balances, equipment purchase orders and bookkeeping materials were destroyed. Such speculation results in clearly erroneous factual determinations. Spoliation by the pound is not a proper analysis and should not be accepted.

---

consequently, had no obligation to preserve evidence as of March 2014, the District Court disregarded this evidence and found it to be "unavailing." (SPA-30; JA-2491).

The only uncontroverted evidence is that the documents that were destroyed consisted of business records not relevant to the litigation, and therefore vitiating the first and third spoliation elements. Destroyed documents came exclusively from the files of Mr. Carbone. (JA-371, 375, 378). Environmental and legal records, including documents referencing PCBs and TCE, ELGUA's correspondence with NYSDEC, legal records, and records concerning the 2008 purchase, are not part of these records and were preserved. (JA-379, 380). The District Court's conclusion about the relevance of the destroyed documents in the face of this evidence is mere conjecture.

The obligation to preserve applies only to records that are relevant to the litigation. *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 118 (S.D.N.Y. 2008). A corporation is not obligated to preserve every shred of paper in its possession in perpetuity. Rather, the obligation to preserve extends only to "unique, relevant evidence that might be useful to an adversary." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217; *see also Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*, 248 F.R.D. 126, 144 (S.D.N.Y. 2007). Relevance in the context of spoliation means something more than sufficiently probative under Federal Rule of Evidence 401, and the party seeking an adverse inference must present evidence from which a reasonable trier of fact could infer that "the destroyed evidence would have been of

the nature alleged by the party affected by its destruction." *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998).

Relevance must be affirmatively demonstrated through extrinsic evidence so that a reasonable jury could find the missing evidence would have been favorable to the claims alleged by the affected party. *Curcio v. Roosevelt Union Free Sch. Dist.*, 283 F.R.D. 102, 113-14 (E.D.N.Y. 2012). There is no extrinsic evidence showing the missing documents would have been helpful to Appellees or harmful to ELGUA to support a finding of spoliation. *See In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297, 321 (S.D.N.Y. 2013) (relevance not established when plaintiffs did not explain what specific documents were missing or their importance); *Scalera v. Electrograph Sys., Inc.*, 262 F.R.D. 162, 178-79 (E.D.N.Y. 2009) (plaintiff failed to establish relevance of destroyed emails when offering no support for claim that emails would have supported plaintiff's case).

The District Court discounted the adequacy of Mr. Schweizer's document review by referencing ELGUA's accountant's advice, the length of the review time, that a nameless German representative of ELGUA ordered the destruction of documents, the lack of a record of what was destroyed, and a gap in the records. (SPA-30-31, 33-34; JA-2489-2490, 2492-2493). There remains, however, no extrinsic evidence that the missing documents would have been helpful to Appellees

or harmful to ELGUA. The District Court adopted Appellees' arguments without question, even though controverted by evidence of record.

Mr. Schweizer testified many documents that Appellees sought in the District Court were, in fact, *not* destroyed or removed from Herkimer. Inventory records reflecting (1) the source of scrap delivered, (2) material purchased, including amount and source, and (3) the destination and purchaser of the scrap, were not removed. These inventory records were not intermixed with Mr. Carbone's accounting records and thus not destroyed. (JA-371, 375, 384-386). Documents transferred from storage units to Herkimer were not destroyed, and environmental documents therein were culled and segregated from other documents based upon communications with counsel. (JA-381-382).

Because Mr. Carbone's files contained financial business records, Mr. Schweizer received guidance from ELGUA's accountants regarding documents to destroy or retain. (JA-375-376, 425-427). The only records Mr. Schweizer identified for destruction were from Mr. Carbone's office. Mr. Schweizer carefully reviewed, identified, and segregated documents to be destroyed over several months' time. (JA-379, 380-381).

No evidence exists to support the conclusion that a German employee traveled to Herkimer and identified documents for destruction. ELGUA's own internal investigation involving searches of email records, calendar search, search of Mr.

Bongers' travel records and confirmation of meetings by German individuals at Herkimer reveal the existence of no such employee. (JA-536, 540, 544-546). Mr. Schweizer, the only person who reviewed documents, further disputes the existence of this supposed German employee. Mr. Schweizer, along with Mr. Carbone, decided to remove documents to obtain needed storage space, and no person from Germany traveled to Herkimer in connection with destruction of documents. (JA-375, 383-384).

The District Court erroneously disregards this evidence, instead relying upon the testimony of Mr. Kinsella, who never identified the German employee, never reviewed any documents, and never even looked in the boxes of documents that were being destroyed. (JA-263) He does not know what criteria were used to identify boxes for destruction. (JA-177). The record evidence controverts the District Court's factual conclusions, which are improperly based upon speculation.

B.    <u>The District Court abused its discretion by determining ELGUA is grossly negligent.</u>

The requisite culpable state of mind for spoliation is determined on a case-by-case basis requiring at times a party to have intentionally destroyed evidence, acted in bad faith, or acted with gross negligence. *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 108 (2d Cir. 2001). Gross negligence is "a failure to exercise even that care which a careless person would use." *MPM Silicones, LLC v. Union Carbide Corp.*, 2015 U.S. Dist LEXIS 195720, at *16, (N.D.N.Y. Oct. 13, 2015).

56

"Gross negligence requires conduct that is 'highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious the defendant must have been aware of it,' that is, 'conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.'" *Minda v. United States*, 851 F.3d 231, 238 (2d Cir. 2017) (quoting *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009) (internal quotation marks and citations omitted)).

The District Court improperly concludes that ELGUA's failure to preserve evidence constituted gross negligence, relying on several points, including: (1) ELGUA did not institute a litigation hold, (2) ELGUA did not maintain a log or index of the documents removed from the Herkimer location, (3) destruction occurred in contradiction to ELGUA's unwritten or informal document retention policy to not destroy documents, and (4) Mr. Schweizer relied upon an accountant's list of documents to be reviewed. (SPA-31-32; JA-2493-2493).

The District Court's analysis is misplaced. The failure to institute a litigation hold does not constitute gross negligence per se, only a factor to be considered. *Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012) *cert. denied* 569 U.S. 904 (2013); *see also Orbit Comm'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 441 (S.D.N.Y. 2010). Also, the District Court's reliance on *Dataflow,*

*Inc. v. Peerless Ins. Co.*, is unavailing. 2013 U.S. Dist. LEXIS 183398 (N.D.N.Y. June 6, 2013). In *Dataflow*, defendant insurance company failed to preserve certain emails related to plaintiff's insurance claim. The emails were destroyed due to a system-wide upgrade affecting all employees that resulted in automatic deletions of all emails not otherwise marked for preservation. Defendant implemented the change on a staggered basis over a twelve-month period, providing employees a prior warning notice of the upgrade's effect upon the retention of emails. Defendant had a document retention policy that employees retain all business records related to a claim made under a commercial property policy for a period of six years after the claim is either paid or denied, and any disputes regarding the claim have been settled. *Id*. at *10-11.

Evidence established that: defendant's employees regularly used email to correspond about claims generally, as well as in connection with a similar prior claim by plaintiff; defendant communicated about the specific claim at issue via email; no litigation hold was implemented despite the company-wide system upgrade and warning to all employees that the upgrade would involve deletion of emails not otherwise marked for preservation, and; email destruction occurred after system upgrades began and after defendant had an obligation to preserve evidence after litigation commenced. *Id*. at *10-11, *19-20.

*Dataflow* is easily distinguishable from the circumstances here. ELGUA did not consciously disregard a company-wide notification or policy that documents at Herkimer were to be preserved; employees had no knowledge the documents destroyed were, in fact, relevant to the future litigation at issue (and they were not relevant); and ELGUA was not aware that it had a duty to preserve the documents at issue based upon prior litigation. There certainly was no wholesale failure by ELGUA to communicate about the destruction of documents in March 2014 that could form a basis for a determination of gross negligence. *See Adorno v. Port Auth. Of New York & New Jersey*, 258 F.R.D. 217, 228-29 (S.D.N.Y. 2009) (fact that some employees were unaware of or unfamiliar with document preservation or destruction polices does not support finding of gross negligence). The uncontroverted evidence is that documents were destroyed to create needed storage space. (JA-263; JA-375).

The evidence further establishes it was ELGUA's policy "not to destroy anything" (JA-372; JA-480-481) and that ELGUA had in place a system to preserve pertinent business and legal records forever, while other records were maintained for three or six years depending on their contents. (JA-380). Mr. Schweizer reviewed documents for environmental records before documents were destroyed and did not identify for destruction any environmental documents, documents referring to PCBs or TCE, communications with the NYSDEC, and other Site-related environmental concerns. (JA-381). ELGUA's record keeping practices and

the failure to log or index documents that were destroyed or removed does not equate to gross negligence. *See Minda*, 851 at 238; *AMW Materials*, 584 F.3d at 454. The District Court's finding that ELGUA spoliated evidence constitutes an abuse of discretion and should be reversed.

## **CONCLUSION**

For the reasons discussed herein, the District Court's March 27, 2023 Memorandum-Decision and Order and October 2, 2023 Judgment should be reversed. This case should be remanded to the District Court for further proceedings.

DAVID L. COOK
PHILLIPS LYTLE LLP
228 East Main Street, Suite 210
Rochester, New York 14614
(585) 238-2000
dcook@phillipslytle.com

/s/STEVEN W. ZOFFER
STEVEN W. ZOFFER
PETER T. STINSON
BRETT W. FARRAR
DICKIE, MCCAMEY & CHILCOTE, P.C.
Two PPG Place, Suite 400
Pittsburgh, Pennsylvania 15222
(412) 281-7272
szoffer@dmclaw.com
pstinson@dmclaw.com
bfarrar@dmclaw.com

*Attorneys for Plaintiff-Counter-Defendant-Appellant ELG Utica Alloys, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.  This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because:

    This brief contains 13,527 words, excluding the parts of the brief exempted by Fed.R.App.32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P32(a)(6) because:

    This brief has been prepared in Proportionally-Space typeface using Microsoft Word, in Times New Roman, Font Size 14.

Dated: February 6, 2024

**SPECIAL APPENDIX**

i

# Table of Contents

**Page**

Judgment of the United States District Court Northern District
of New York, Dated October 2, 2023, Appealed From ............SPA-1

Memorandum-Decision and Order of Honorable
Brenda K. Sannes, Dated March 27, 2023 ...............................SPA-2

[Docket Text] Order of the Honorable Brenda K. Sannes,
Dated October 2, 2023 .............................................................SPA-57

SPA-1

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

### JUDGMENT IN A CIVIL CASE

---

ELG UTICA ALLOYS, INC.,

                           Plaintiff,

                                             6:16-cv-1523 (BKS/ATB)

v.

NIAGARA MOHAWK POWER CORP. d/b/a National Grid,
SPECIAL METALS CORP., GENERAL ELECTRIC
COMPANY, EMPIRE RECYCLING CORP., and CHICAGO
PNEUMATIC TOOL COMPANY, LLC,

                           Defendants.

---

**Decision by Court.**  This action came to a hearing before the Court.  The issues have been heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that Defendants' motion for summary judgment (Dkt. No. 246 ) is GRANTED. It is further ORDERED that Plaintiff's CERCLA Section 107(a) claim (Count I), CERCLA Section 113(f)(1) claim (Count II), and declaratory judgment claim (Count IV) are DISMISSED with prejudice. It is further ordered that the State Law claims (Counts III and V) in the Amended Complaint are dismissed without prejudice, all in accordance with the Orders of the Honorable Brenda K. Sannes issued March 27, 2023 and October 2, 2023.

DATED: October 2, 2023

                           _____
                           Clerk of Court

                           _____
                           N. Eallonardo
                           Deputy Clerk

SPA-2

# Federal Rules of Appellate Procedure
## Rule 4. Appeal as of Right

### (a) Appeal in a Civil Case.

1. (1) *Time for Filing a Notice of Appeal.*

(A) In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

(B) The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

(i) the United States;

(ii) a United States agency;

(iii) a United States officer or employee sued in an official capacity; or

(iv) a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf — including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

(C) An appeal from an order granting or denying an application for a writ of error *coram nobis* is an appeal in a civil case for purposes of Rule 4(a).

(2) *Filing Before Entry of Judgment.* A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.

(3) *Multiple Appeals.* If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

(4) *Effect of a Motion on a Notice of Appeal.*

(A) If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

(i) for judgment under Rule 50(b);

(ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

(iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

(iv) to alter or amend the judgment under Rule 59;

(v) for a new trial under Rule 59; or

(vi) for relief under Rule 60 if the motion is filed no later than 28 days after the judgment is entered.

(B)(i) If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

(ii) A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal—in compliance with Rule 3(c)—within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

(5) *Motion for Extension of Time.*

(A) The district court may extend the time to file a notice of appeal if:

(i) a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

(ii) regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

(B) A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

(C) No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

(6) *Reopening the Time to File an Appeal.* The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

(A) the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77 (d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

(B) the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77 (d) of the entry, whichever is earlier; and

(C) the court finds that no party would be prejudiced.

(7) *Entry Defined.*

(A) A judgment or order is entered for purposes of this Rule 4(a):

(i) if Federal Rule of Civil Procedure 58 (a) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79 (a); or

(ii) if Federal Rule of Civil Procedure 58 (a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

• the judgment or order is set forth on a separate document, or

• 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79 (a).

(B) A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58 (a) does not affect the validity of an appeal from that judgment or order.

$$\boxed{\textbf{SPA-3}}$$

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ELG UTICA ALLOYS, INC.,

                              Plaintiff,                         6:16-cv-1523 (BKS/ATB)

v.

NIAGARA MOHAWK POWER CORP. d/b/a National
Grid, SPECIAL METALS CORP., GENERAL ELECTRIC
COMPANY, EMPIRE RECYCLING CORP., and
CHICAGO PNEUMATIC TOOL COMPANY, LLC,

                              Defendants.

---

NIAGARA MOHAWK POWER CORP. d/b/a National
Grid,

                            Third-Party Plaintiff,

v.

CBS CORPORATION (successor-in-interest to
Westinghouse Electric Corporation),

                            Third-Party Defendant.

---

**Appearances:**

*For Plaintiff:*
David P. Flynn
David L. Cook
Robert Reagan
Phillips Lytle LLP
One Canalside
125 Main Street
Buffalo, NY 14203

*For Defendant Niagara Mohawk Power Corp. d/b/a National Grid:*
Yvonne E. Hennessey
Barclay Damon LLP
80 State Street
Albany, NY 12207

SPA-4

*For Defendant Special Metals Corp.:*
Doreen A. Simmons
Hancock Estabrook, LLP
1800 AXA Tower I
100 Madison Street
Syracuse, NY 13202

*For Defendant General Electric Company:*
Kristin Carter Rowe
Dean Sommer
Young/Sommer LLC
Executive Woods
Five Palisades Drive
Albany, NY 12205

*For Defendant Empire Recycling Corp.:*
Gary S. Bowitch
Law Office of Gary S. Bowitch
13 Willow Street
Castleton, NY 12033

*For Defendant Chicago Pneumatic Tool Company, LLC:*
Agnes Antonian
Connell Foley, LLP
56 Livingston Avenue
Roseland, NJ 07068

*For Third-Party Defendant CBS Corporation (successor-in-interest to Westinghouse Electric Corporation):*
Marc J. Felezzola
James D. Mazzocco
Babst, Calland, Clements & Zomnir, P.C.
Two Gateway Center
603 Stanwix Street, 8th Floor
Pittsburgh, PA 15222

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff ELG Utica Alloys, Inc. brings this action asserting claims under the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980

("CERCLA"), 42 U.S.C. §§ 9601–9675; under Article 12 of the New York Navigation Law; and

for contribution under the New York Civil Practice Law and Rules ("CPLR") and New York

common law. (Dkt. No. 43 (amended complaint)). Plaintiff seeks response costs and damages

arising out of the release or threatened release of hazardous substances at "the Universal Waste

Site," which "operated as a metal recycling operation" in Utica, New York from the 1950s until

2012. (*Id.* ¶¶ 1–2). Plaintiff seeks to hold Defendants Niagara Mohawk Power Corp. d/b/a

National Grid ("National Grid"), Special Metals Corp. ("SMC"), General Electric Company

("GE"), Empire Recycling Corp. ("ERC"), and Chicago Pneumatic Tool Company, LLC ("CP")

liable for their share of approximately $6,700,000 in "past response costs and other damages . . .

incurred from 2012 to date" and "future response costs and damages." (*Id.* ¶¶ 1, 9).

Presently before the Court is the joint motion of Defendants and Third-Party Defendant

CBS Corporation (successor-in-interest to Westinghouse Electric Corporation) ("CBS") for

summary judgment and spoliation sanctions pursuant to Rules 56 and 37 of the Federal Rules of

Civil Procedure. (Dkt. No. 246).[1] The motion is fully briefed. (*See* Dkt. Nos. 247–258, 264,

265). For the following reasons, the Court grants Defendants' motion for spoliation sanctions but

defers selection of the sanction, and grants Defendants' motion for summary judgment.

## II.   BACKGROUND

### A.   Facts Relating to Defendants' Summary Judgment Motion[2]

#### 1.   Site Background

The Universal Waste Site at issue in the complaint is an approximately 20-acre parcel of

land located in Utica, New York near the intersection of Leland and Wurz Avenues. (Dkt. No.

---

[1] For purposes of this decision, the Court refers collectively to the Third-Party Defendant and all Defendants as "Defendants." The Court authorized Defendants to "proceed with one joint, early dispositive motion" which would address "only statute of limitation defenses, plaintiff's CERCLA contribution claim, and defense spoliation claims." (Text Minute Entry dated Apr. 18, 2022); *see also* Fed. R. Civ. P. 14(a)(2)(C) (providing that a third-party defendant "may assert against the plaintiff any defense that the third-party plaintiff has to the plaintiff's claim").

[2] The facts are drawn from Defendants' Joint Statement of Undisputed Material Facts, Plaintiff's Statement of Additional Material Facts, and the parties' respective responses, (Dkt. Nos. 246-2, 264, 264-1, 265-1, 265-2), to the

246-2, ¶ 1; Dkt. No. 264, ¶ 1; Dkt. No. 265-1, ¶ 1). The Universal Waste Site at issue is part of a 23-acre parcel of land owned by Plaintiff ("the full Site" or "the Site"), which in 1998 was administratively bifurcated to facilitate the remediation of approximately 1.5 acres of the Site. (The 1.5-acre parcel was designated the "Utica Alloys, Inc." Site.) The 23-acre Site is in close proximity to the Mohawk River and "located in a flood plain." (Dkt. No. 253-5, at 2; *see also* Dkt. No. 253-9, at 5).

As relevant here, Utica Alloys, Inc. and Universal Waste, Inc. (together, "the Companies") conducted operations at the full Site, including scrap recycling operations. (*See* Dkt. No. 246-2, ¶ 2; Dkt. No. 264, ¶ 2; Dkt. No. 43, ¶ 2 (alleging that the "Site operated as a metal recycling operation from at least the 1950s until 2012")). Utica Alloys, Inc. was formed to "deal in, buy, sell and process all high and low temperature alloys . . . ; to operate vacuum melt furnaces, found[]ries and deal generally in reclamation of alloys; [and] to process all non-ferrous metals." (Dkt. No. 252-4, at 2). Universal Waste, Inc. was formed to "buy, sell, reclaim, manufacture, convert and deal in waste metal, waste paper, rags, iron, steel, [and] non-ferr[o]us metals." (Dkt. No. 252-5, at 2; *see also* Dkt. No. 253-9, at 4 ("Universal Waste, Inc. is engaged in the buying and selling of paper, metal, and other waste materials. Utica Alloys, Inc. is engaged in the buying, selling, processing, and reclaiming of high- and low-temperature alloys, and non-ferrous metals.")). The Companies had the same voting stockholder, officers, and directors; used the same buildings and areas at the Site; and shared Site costs. (Dkt. No. 246-2, ¶ 3; Dkt. No.

---

extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The Court does not consider the declarations of Attorneys Yvonne E. Hennessey, Kristin Carter Rowe, and David Flynn, (Dkt. Nos. 247, 252, 264-2, 265-3, 265-4), to the extent those attorney declarations relate to Defendants' motion for summary judgment and consist of attorney argument or characterization of the record evidence. *See, e.g., Fed. Trade Comm'n v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) (declining to consider the "legal arguments and factual allegations contained within the [attorney] declaration" where the declaration went "beyond the introduction of documents and veer[ed] into legal argument and factual allegations for which [the attorney] ha[d] no personal knowledge"). The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

SPA-7

264, ¶ 3). Since at least 1984, the 23-acre Site has been owned by the same company. (*See* Dkt.

No. 252-10 (1984 indenture transferring the property to Clearview Acres Limited, Inc.

("Clearview") and 1984 leases of the property to the Companies)); *see infra* Section II.A.7

(detailing 2008 sale of property to Plaintiff).

### 2.   1977 Discovery of Contamination at the Site and 1979 Response

In a July 19, 1977 letter to Universal Waste following an inspection of the Site, the New

York Department of Environmental Conservation ("NYSDEC") expressed "concern" with "the

handling of electrical components such as transformers and capacitors, and . . . the possible

discharge of solvents from [Universal Waste's] degreasing operation." (Dkt. No. 253-2, at 2).

NYSDEC noted that large transformers and capacitors "may be filled with" polychlorinated

biphenyls ("PCBs"), a harmful substance. (*Id.*). NYSDEC sampled the soil in the vicinity of the

stockpile of transformers and capacitors and noted that "positive action will have to be taken" if

PCBs were detected. (*Id.*). Analysis of the samples taken revealed the presence of PCBs and

trichloroethylene ("TCE"), another harmful substance. (Dkt. No. 253-3 (memorandum dated

March 30, 1979 enclosing laboratory results)). The EPA inspected the Site on October 24, 1979,

and in a "potential hazardous waste site identification and preliminary assessment," noted

concerns about PCBs on the Site; the EPA reported that "remedial activity" in the form of soil

removal was being performed. (Dkt. No. 253-4, at 16–19).

In late 1979, after requesting and receiving information from NYSDEC regarding the

logistics of off-site disposal, Universal Waste removed both PCB-contaminated capacitors and

transformers and contaminated soil from the Site for disposal. (*See generally* Dkt. No. 253-4).

Universal Waste entered into a contract with Newco Chemical Waste Systems, Inc. for the

transportation and disposal of "[w]astes containing PCB's," including "capacitors, properly

drained transformers, contaminated soil . . . [and] properly drained containers (drums)." (*Id.* at 8–

5

SPA-8

11). A straight bill of lading dated November 27, 1979 indicates that Newco transported 22 "PCB Article containers (drums)" weighing 3598.18 kilograms. (*Id.* at 12–13). An entity called CECOS International Inc. subsequently informed NYSDEC that it "accepted twenty-two (22) drums of PCB material" from Universal Waste at its Niagara Falls site and disposed of the material on December 1, 1979. (*Id.* at 20).

On November 26, 1979, a representative from the United States Environmental Protection Agency ("EPA") wrote to a United States Congressman in response to an inquiry concerning the Site. (*Id.* at 14). The EPA noted that NYSDEC was "aware of the [contamination] problem" and that the "present owners are working with NYSDEC officials in having the contaminated material moved to a secure location." (*Id.*). There did "not appear to be a threat to the Mohawk River" or "evidence of leaching or any movement of the contaminated soil." (*Id.*).

### 3.   1980s: Registry Listing, 1982 Agreement, and Clayton Study

In 1980, the full 23-acre Site was listed on the New York State Registry of Inactive Hazardous Waste Disposal Sites (the "Registry"). (Dkt. No. 253-5, at 1–3). The Site was called "Universal Waste, Inc." and given a site code of 633009. (*Id.* at 2). NYSDEC noted that its "environmental inspection team d[id] not believe that the Universal Waste site pose[d] an 'imminent health hazard' to water supplies or the surrounding area" and that remedial action had been "[p]roposed." (*Id.* at 3).

In March 1981, counsel for the Companies wrote to NYSDEC "hop[ing]" that NYSDEC was satisfied that "no hazardous waste problem [wa]s presented" by the Site and requesting that the Site be deleted from the Registry. (Dkt. No. 253-6, at 2). Attorney Vincent Rossi represented that the Companies had "never had a disposal site on [the] premises." (*Id.*).

In a letter dated January 7, 1982, NYSDEC wrote to Joseph Jiampietro, President of the Companies, stating that the agency was "continuing to investigate the disposal of hazardous or

6

industrial wastes and materials at the approximately 23 acre Universal Waste/Utica Alloys Site."
(Dkt. No. 253-7, at 2). NYSDEC stated that, after its investigation, it would determine "whether
any further action should be taken concerning the site." (*Id.*). NYSDEC's letter "constitute[d] a
formal request" pursuant to New York state law for the Companies to furnish a range of
specified documents and records relating to the Site. (*Id.* at 2–4).

In August 1982, the Companies and NYSDEC entered into an Agreement and
Determination (the "1982 Agreement"). (Dkt. No. 253-8). The Companies agreed to conduct a
"field investigation" and provide a "field investigation report, with the goal of identifying any
threat to the environment posed by the prior disposal of industrial and hazardous wastes at and in
the vicinity of the Site." (*Id.* at 3). To accomplish this goal, the Companies retained Clayton
Environmental Consultants, Inc. ("Clayton"), who investigated the 23-acre Site in 1983 and
issued a revised Waste Management Study report on March 21, 1984 (the "Clayton Study"). (*See*
Dkt. No. 253-9). The Clayton Study recounted that "PCB electrical equipment" previously
deposited at the Site was "cleaned up in conformance with N.Y.D.E.C. regulations shortly after
discovery of the spilled material." (*Id.* at 4). The investigation involved sampling and analysis of
groundwater, surface soil, sewers, sediment, and ambient air. (*See id.* at 8–33). Generally, the
Clayton Study found the continued presence of PCBs and TCE at the Site. (*Id.* at 11–12, 34–35).
Clayton concluded that "[c]ontaminated surface soil in well-defined areas is present on the Utica
Alloys property. Immediate action is called for in the PCB-contaminated area . . . to prevent
possible excessive exposure to onsite personnel." (*Id.* at 36). There was "no indication of
hazardous wastes having been buried onsite." (*Id.*). While the "groundwater under the property is
contaminated with PCBs" and other contaminants, Clayton could not determine the "degree to

which the Utica Alloys operations have contributed to this contamination." (*Id.*). Clayton found "no immediate health hazard posed by the [observed] groundwater contamination." (*Id.*).

In March 1986, NYSDEC sought a summary enforcement order which would require Clearview and the Companies to "develop and implement an inactive hazardous waste disposal site remedial program and pay the Department's administrative costs related to the inactive hazardous waste disposal site," "bring [the] facility into compliance" with New York regulations, and "pay a penalty for the cited violations of such regulations." (Dkt. No. 254, at 3–4). Later that month, Mr. Jiampietro wrote to New York Governor Mario Cuomo requesting his office's involvement. (Dkt. No. 254-1). Mr. Jiampietro represented that the Companies had been "studying" the Site's "PCB hot spots" and "traces" of TCE "for the past 5 years" and that the conditions were not "new." (*Id.* at 2). He noted that the Companies had "spent nearly $500,000[] on anti-pollution environmental equipment, engineering studies, clean-ups and legal fees." (*Id.*). In April 1986, Mr. Jiampietro submitted a sworn affidavit in opposition to NYSDEC's motion for a summary order. (Dkt. No. 254-2). Mr. Jiampietro generally argued that the source of the TCE contaminant was upgradient of the Site and requested that NYSDEC "implead the source of PCB's (and TCE)." (*Id.* at 5–6).

In May 1986, NYSDEC reclassified the Universal Waste Site on the Registry, changing the Site's code from a "2a to a 2 effective January 1, 1986." (Dkt. No. 253-5, at 4–5). Under New York Environmental Conservation Law, a Class 2 site is one which poses a "significant threat to the public health or environment – action required." (*Id.* at 4); *see* N.Y. Env't Conserv. Law § 27-1305(2)(b)(2). By letter dated June 27, Clearview and the Companies requested that NYSDEC "de-list or reclassify" the Site. (Dkt. No. 254-3). Their counsel stated that they "have taken all reasonable steps necessary to thoroughly investigate and remediate this highly

industrialized site," including "the surface removal, proper disposal of PCBs with the approval

and co[n]currence of [NYSDEC] personnel," "implementation of a hazardous waste [TCE]

sludge treatment program," and arranging for the Clayton Study. (*Id.* at 2). NYSDEC denied this

petition for reclassification or delisting. (Dkt. No. 254-4).

In 1989, the Companies moved to join "several additional parties," including Defendants

SMC and GE, to NYSDEC's enforcement action regarding the Site. (*See* Dkt. No. 254-5, at 3–

4). In denying this request, NYSDEC noted that the Companies "may seek relief against" the

parties they sought to join "in a separate [CPLR] contribution action." (*Id.*).

### 4.      The 1990s

In an internal NYSDEC memorandum dated November 19, 1991, the agency summarized

the history of the 1982 Agreement and the 1986 enforcement action. (Dkt. No. 254-9, at 2).[3]

NYSDEC stated that the hearing initiated by the 1986 enforcement action had not been resolved

and "seem[ed] no closer to being resolved today than in 1986." (*Id.*). The agency noted that the

Companies were not willing to conduct a remedial investigation/feasibility study ("RI/FS")

"without a number of other parties being involved" and recommended that the State conduct its

own RI/FS. (*Id.* at 2–3). NYSDEC stated that the Site was "high on the region 6 list of priority

sites" but not an "imminent threat." (*Id.* at 3).

In an April 1992 memorandum written by the Companies' counsel,[4] Attorney Michael

Gerrard noted that the Companies "operate a scrap metal processing facility and allied operations

in Utica." (Dkt. No. 254-10, at 2). He also noted that Mr. Jiampietro "would like to [] delay the

---

[3] There is some evidence in the record that additional soil excavation and removal may have occurred at the Site sometime in 1989 or 1990. (*See* Dkt. Nos. 254-7, 254-8).

[4] Attorney Rowe states that while this memorandum is "arguably privileged or protected material," Plaintiff "willingly produced at least five (5) different copies of it in this litigation" on separate occasions and did not respond when defense counsel inquired if Plaintiff would like to claw back the document. (Dkt. No. 252, ¶ 51 n.1).

investigation and remediation of the site as long as possible." (*Id.* at 4). In July 1992, Attorney Gerrard wrote to NYSDEC denying the agency access to the Site "for the purpose of beginning the RI/FS process,"[5] noting that the Companies had appealed to the NYSDEC Commissioner in an effort to stop the RI/FS. (Dkt. No. 254-12).

In November 1993, NYSDEC's Director of the Division of Environmental Enforcement told Attorney Gerrard that a "supplemental investigation" of the Site "rather than an RI/FS" was "called for under the current circumstances." (Dkt. No. 254-13, at 2). This letter references the 1989 removal of "two 'PCB hot spots'" and asserted that "[a]ny such discreet remedial actions that were taken did not occur with any Departmental oversight and the impact of such actions on site conditions must be evaluated." (*Id.*). The results of the supplemental investigation would "determine what, if any, further steps should be taken both on and off-site." (*Id.* at 3). In December, the Companies expressed willingness to "conduct an investigation of the property on which they operate" and supported NYSDEC's proposal to "design an investigation of [] offsite sewers, groundwater and surface water." (Dkt. No. 255, at 2).

On October 12, 1995, NYSDEC, the Companies, and Clearview entered into an Order on Consent (the "1995 Consent Order") pursuant to which the Companies and Clearview agreed to develop and implement a "Supplemental Investigation . . . which will gather data to enable the Department to characterize hazardous substances and hazardous wastes which are or may be present on the Utica Alloys portion of the Site." (Dkt. No. 255-5, at 2–3). The supplemental investigation was to be performed in accordance with a Department-approved work plan that was incorporated into the Consent Order. (*Id.* at 3–4).

---

[5] It appears that NYSDEC had contacted the Companies to inform them that a NYSDEC contractor "for the RI/FS" would be visiting the Site on August 5, 1992 "to view the site and begin making preparations for the first phase of the remedial investigation." (Dkt. No. 254-12, at 2).

In 1996, the Companies excavated between 25 and 35 tons of contaminated soil for off-site disposal. (*See generally* Dkt. No. 255-6). In July 1996, NYSDEC provided comments on the Companies' Supplemental Investigation Report prepared pursuant to the 1995 Consent Order. (Dkt. No. 255-7). NYSDEC concluded that "the Universal Waste/Utica Alloys site is the source of contamination of PCBs and TCE in the municipal sewer and groundwater." (*Id.* at 2; *see id.* at 3 ("[T]he Department concludes that the Utica Alloys facility is contaminated with TCE & PCBs and that contamination is not coming from off site.")). NYSDEC indicated that Clearview and the Companies would need to conduct a RI/FS "as soon as possible." (*Id.* at 3). NYSDEC "suggest[ed] a single RI/FS of the whole site," but stated that it "would be open to th[e] possibility" of "a supplemental site investigation on the Universal Waste portion first" if they preferred. (*Id.*).

In connection with a trommeling project in 1997 and a sewer line project in 1998 at the Site, Universal Waste and/or Utica Alloys excavated additional PCB-contaminated soil and disposed of it off-Site. (*See generally* Dkt. Nos. 255-8, 255-9; Dkt. No. 246-2, ¶¶ 31–32; Dkt. No. 264, ¶¶ 31–32).

**5.    1998 Administrative Bifurcation of the Site**

In an April 1994 letter to NYSDEC, counsel for the Companies requested that the agency "bifurcate the investigation of the Site, so that the investigation and cleanup of the Utica Alloys portion of the Site can proceed swiftly to cleanup and delisting." (Dkt. No. 255-1, at 3). In an internal memorandum dated September 13, 1995, NYSDEC indicated that it "ha[d] no problem with a phased approach" that would address the Utica Alloys portion of the Site first, "as long as [the agency] ha[d] some assurance that the second phase (investigation of the Universal Waste portion of the site) will actually take place in a timely manner." (Dkt. No. 255-3, at 2; *see also*

Dkt. No. 255-4, at 2 (NYSDEC memorandum indicating that staff had agreed to a proposed

consent order for the "Utica Alloys parcel" portion of the Site)).

By letters dated August 7, 1998, NYSDEC confirmed that it would separately list the

"Utica Alloys portion of the Universal Waste Site" on the Registry. (*See* Dkt. No. 255-13). The

new site consisting of the Utica Alloys portion of the full 23-acre Site, which was estimated to be

1.5 acres, was named "Utica Alloys, Inc.," given a site code of 633047, and given a class code of

2 (the "Utica Alloys Site"). (*Id.* at 2–4). NYSDEC noted that the Utica Alloys "section of the site

is being listed as a separate site in order to facilitate an independent remediation of this

property." (*Id.* at 4). NYSDEC noted: "High concentrations of [TCE] have been found in both

groundwater and the soils at this site. PCBs have also been detected above the concentrations

required for soil cleanup objectives. The TCE concentrations in the vicinity of the former storage

tank are a potential source of ongoing groundwater contamination." (*Id.*). The "Universal Waste,

Inc." site with the original 633009 site number consequently consisted of "the remainder of the

original site" (the "Universal Waste Site"). (*Id.* at 7). At the time of the Site's bifurcation,

NYSDEC "delay[ed] making a determination regarding the level of threat posed by The

Universal Waste site pending a planned Preliminary Site Assessment" and gave the Universal

Waste Site a class code of 2a. (*Id.*); *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d

212, 218 n.2 (2d Cir. 2014) ("*NYSEG*") ("Class 2a is a temporary classification assigned to a site

that has had inadequate and/or insufficient dat[a] for inclusion in any of the other

classifications.").

### 6.    1999 Consent Order and Early 2000s

On September 24, 1999, NYSDEC, Utica Alloys, and Clearview entered into an Order on

Consent regarding the Utica Alloys Site (the "1999 Consent Order"). (Dkt. No. 255-14). Utica

Alloys and Clearview agreed to conduct an RI/FS which had been approved by NYSDEC. (*Id.* at

2–3). As part of the feasibility study, Utica Alloys and Clearview were required to "evaluat[e] on-Site and off-Site remedial actions to eliminate, to the maximum extent practicable, all health and environmental hazards and potential hazards at the [Utica Alloys] Site." (*Id.* at 4). They also agreed to conduct possible Interim Remedial Measures ("IRMs") pending selection of a "final remedial alternative for the Site." (*Id.* at 5).

On May 9, 2000, NYSDEC, Universal Waste, and Clearview entered into an Order on Consent regarding the Universal Waste Site (the "2000 Consent Order"). (Dkt. No. 256). Pursuant to this consent order, Universal Waste and Clearview agreed to conduct a Preliminary Site Assessment ("PSA") of that Site in accordance with a Department-approved work plan. (*Id.* at 2–3). The 2000 Consent Order noted that "the presence of PCBs in the Site's soils" had been "confirm[ed]," and that the goal of the PSA was to "gather data to enable the Department to characterize hazardous wastes which are or may be present at the Site and to enable the Department to determine whether such wastes constitute a significant threat to public health or the environment necessitating remediation." (*Id.*).

### a.   2002 Soil Disposal

In June 1999, Universal Waste informed NYSDEC that it "plan[ned] to erect a new building" at its Site and do "sampling to verify that the area under the pad is not contaminated." (Dkt. No. 256-1, at 2). "PCBs were detected in seven of the 10 samples" taken. (Dkt. No. 264-3, at 2). The company who did the sampling and analysis concluded that the "low levels of PCBs in the soil do not represent a significant threat, although two of the samples d[id] exceed a regulatory limit." (*Id.*). Nearly two years later, in April and May 2002, approximately 515 tons of contaminated soil were transported and disposed of off-Site. (*See* Dkt. No. 256-2, at 2 (purchase order for the loading of hazardous soils, transportation, and disposal dated April 18, 2002); Dkt. No. 256-3 (hazardous waste manifests dated between May 1 and 7, 2002 for the transportation

13

and off-Site disposal of 515 tons of soil)). The waste manifests indicate that the soil was contaminated with chromium and lead. (*See generally* Dkt. No. 256-3).

In August 2003, NYSDEC invoiced Universal Waste for $40,000 in regulatory fees for the generation of more than 500 tons of hazardous waste for the years 2002 and 2003. (Dkt. No. 256-4, at 2–5). Bret Copple of Utica Alloys, acting on behalf of Universal Waste, disputed the fees charged on the ground that "the waste soil removal from the Universal Waste site should in fact fall under the criteria for exemption as remediation of an inactive waste disposal site in New York State" and that the "soil removal in 2002 was a one-time event." (*Id.* at 6–15). NYSDEC ultimately revised its invoice and eliminated the $40,000 fee, holding that the Universal Waste Site "is an exempt remedial site not subject to base regulatory fees." (*Id.* at 16–17).

### b.     2007 Soil and Groundwater Disposal

In a September 2007 Fact Sheet, NYSDEC described the IRMs to be implemented at the Utica Alloys Site (633047). (Dkt. No. 256-8; *see id.* at 2 (indicating that a "Remedial Investigation and Interim Remedial Measures Alternative Analysis program was initiated in 1999")). The IRMs were conducted pursuant to the 1999 Consent Order. (*See* Dkt. No. 258, at 6; *see also* Dkt. No. 256-7, at 3 (June 9, 2003 letter from consultant Stearns & Wheler, LLC regarding the planning of the IRMs and noting that PCB "hot spots" "on the south and east sides of the concrete pad at the south side of the building" would be excavated)). Generally, the objectives of the IRMs were to "[r]emove soil containing PCBs from seven areas previously identified in the outside storage area of the facility that are in excess of the recommended soil cleanup objectives," "[r]emove soil above the water table in the vicinity of the former TCE storage tank containing elevated concentrations of TCE and associated [volatile organic compounds]," and "[m]onitor ground water quality in the vicinity of the former TCE storage tank to assess ground water quality changes as a result of the soil removal actions." (Dkt. No.

14

256-8, at 3). It is undisputed that Utica Alloys excavated 715 tons of PCB- and TCE-
contaminated soil for off-site disposal in December 2007. (*See* Dkt. No. 257 (hazard waste
manifests)). Utica Alloys also pumped 6,951 gallons of contaminated groundwater for transfer
and off-site disposal. (Dkt. No. 258, at 10, 12). The excavations "were backfilled to original
grade using 701 tons of crusher run." (*Id.* at 11).

According to Defendants, four of the seven PCB soil areas that were excavated,
stockpiled, transported, and disposed of off-site were in fact located on the Universal Waste Site,
not the Utica Alloys Site. (Dkt. No. 246-2, ¶¶ 47–48). Consultants O'Brien & Gere prepared an
Interim Remedial Measures Report dated December 2010 to "summarize[] IRM activities
completed" for the Utica Alloys property in accordance with the Work Plan approved by
NYSDEC pursuant to the 1999 Consent Order. (Dkt. No. 258, at 6). The report contains a figure
indicating the location of the seven PCB areas, (*id.* at 8, 21), as well as a figure indicating the
location of where the soil was stockpiled before it was ultimately removed from the property, (*id.*
at 9, 23). When compared with a 2013 survey indicating the boundary lines of each site, (Dkt.
No. 258-14, at 2),[6] it appears that three of the seven PCB soil areas that were excavated in 2007
(areas B, C, and D) were located on the Universal Waste Site, and that all of the PCB- and TCE-
contaminated soil was stockpiled on the Universal Waste Site prior to its transport and off-site
disposal. (*Compare* Dkt. No. 258, at 21, 23, *with* Dkt. No. 258-14, at 2). Plaintiff argues that the
excavated soil came entirely from the Utica Alloys Site, (*see* Dkt. No. 264, ¶ 47 (noting that the

---

[6] While there appears to have been some uncertainty regarding the precise boundaries of the Utica Alloys Site after
the bifurcation, (*see* Dkt. Nos. 258-11, 258-12, 258-13), the boundary line issue was definitively resolved by a 2013
survey, (Dkt. No. 258-14; Dkt. No. 264, ¶ 66).

SPA-18

IRM report pertained solely to the Utica Alloys Site)), but does not argue that the figures and survey Defendants point to are erroneous.[7]

In 2008, NYSDEC invoiced Utica Alloys for $206,000 in regulatory fees for the generation of more than 500 tons of hazardous waste per year. (Dkt. No. 258-1). Utica Alloys challenged the agency's fee determination, again claiming an exemption "because the hazardous waste was generated in the remediation of an inactive hazardous waste disposal site subject to an administrative consent order and with the approval of the NYSDEC." (Dkt. No. 258-2, at 2–3). NYSDEC subsequently determined that Utica Alloys was exempt from the fees because "[h]azardous wastes generated at this site in 2007 are exempt remedial wastes from a State Superfund Site (633047)." (Dkt. No. 258-3).

### 7. The 2008 Transaction

In June 2008, ELG Haniel GmbH, a German corporation, purchased the stock of Clearview and the Companies (among other entities). (Dkt. No. 252-1 (Securities Purchase Agreement dated June 30, 2008)). The Securities Purchase Agreement listed among environmental matters the "investigation and remediation of hazardous waste" at the Universal Waste property and referenced the pending enforcement proceeding before NYSDEC (citing site number 0633009). (*Id.* at 67). In August, Clearview and the Companies were merged into Utica Alloys, Inc. (Dkt. No. 252-2 (Certificate of Merger dated August 11, 2008)). Utica Alloys, Inc. changed its name to "ELG Utica Alloys, Inc."—the Plaintiff in this action—in September 2008. (Dkt. No. 252-3 (Certificate of Amendment of the Certificate of Incorporation)).

---

[7] In any event, the resolution of this dispute is not determinative to the Court's decision.

SPA-19

### 8.    Reclassification Petition and Decision

In July 2002, NYSDEC changed the classification of the Universal Waste Site from Class 2a to 2. (Dkt. No. 256-5, at 2). In doing so, NYSDEC referenced the discovery of PCBs on the Site going back at least as far as 1996 and concluded that the PCBs "disposed at the Universal Waste site present a significant threat to the environment" such that remedial action was necessary. (*Id.*). Universal Waste had proposed "capping a one acre area with asphalt as an Interim Remedial Measure." (*Id.*). In 2003, Universal Waste and Clearview petitioned NYSDEC to "delete the Site" from the Registry or, alternatively, to "have the site reclassified as Class 3." (*Id.* at 7); *see* N.Y. Env't Conserv. Law § 27-1305(3) (defining a Class 3 site as one which "[d]oes not present a significant threat to the public health or environment—action may be deferred"). After NYSDEC summarily denied the petition, (Dkt. No. 256-5, at 25), New York Supreme Court ordered that an administrative hearing on the petition held, *Universal Waste, Inc. v. NYSDEC*, 778 N.Y.S.2d 855, 862 (Sup. Ct. Oneida Cty. 2004);[8] (*see* Dkt. No. 256-5, at 27–30 (notice of hearings)).

The NYSDEC Commissioner issued a decision on October 15, 2011, denying the 2003 petition to reclassify the Universal Waste Site on the Registry. (*See generally* Dkt. No. 258-5). The Commissioner found that Universal Waste "failed to carry its burden of proving by a preponderance of the evidence that its site does not present a significant threat to the public health or the environment" and therefore that the Site should remain classified as Class 2. (*Id.* at 35). Plaintiff filed an Article 78 petition in state court challenging the Commissioner's decision. (Dkt. No. 258-6 (first page of notice of petition filed February 14, 2012)). On April 10, 2014, the

---

[8] The state court noted in its decision that the "delay that has surrounded the assessment and remediation of this site is nothing short of mind boggling." 778 N.Y.S.2d at 862.

Appellate Division, Third Department affirmed the Commissioner's decision. *ELG Utica Alloys, Inc. v. Dep't of Envt. Conservation*, 983 N.Y.S.2d 668 (3d Dep't 2014).

### 9.   2012 Notice Letter and Consent Order

After Plaintiff filed its petition to challenge the Commissioner's decision denying the reclassification petition, NYSDEC sent Plaintiff a Notice Letter dated June 7, 2012 concerning the Universal Waste Site (the "2012 Notice Letter"). (Dkt. No. 258-7). NYSDEC informed Plaintiff that it had determined that Plaintiff, as "successor-by-merger" of Clearview and the Companies, was a "responsible party for the site's contamination." (*Id.* at 3). NYSDEC based this determination on "the ownership of the site and adjacent areas by ELG and/or Clearview" and "the long-term operation of the site by Universal Waste, Inc. and/or Utica Alloys, Inc." (*Id.*). NYSDEC stated that it was also sending Notice Letters to other potentially responsible parties ("PRPs"), including Defendants SMC and National Grid. (*Id.*). NYSDEC requested that Plaintiff "develop, implement, and finance a Remedial Program" for the Universal Waste Site. (*Id.*). The letter noted that NYSDEC "began investigating the disposal of PCBs at the site in the late 1970s" and that the Companies had "conducted limited investigations, but ha[d] been unwilling to conduct an RI/FS," and requested that an RI/FS be undertaken "in the immediate future." (*Id.* at 3–4 (emphasis omitted)). The 2012 Notice Letter attached a draft Order on Consent and Administrative Settlement and required Plaintiff to provide a number of records relating to the Universal Waste Site and its history, operations, and handling of hazardous wastes. (*See id.* at 4, 8–23).

Counsel for Plaintiff acknowledged receipt of the 2012 Notice Letter. (Dkt. No. 258-8). As part of Plaintiff's "interim response," it requested copies of any notice letters which were sent to any other PRPs. (*Id.* at 3 ("Please send us copies of any Notice Letters which have been sent to any person regarding the Site or the Mohawk River in the vicinity of the Site." (internal

18

footnote omitted))). Plaintiff also expressed "surprise[]" with NYSDEC's determination that an RI/FS must be conducted "in the immediate future." (*Id.* at 4). By letter dated July 20, 2012, NYSDEC denied another request to reclassify the Universal Waste Site as a Class 3 site. (Dkt. No. 258-9, at 2). NYSDEC indicated that it "has been attempting since 1977 to ensure that the site is properly addressed" but the Universal Waste Site "and its impacted areas have not been fully remediated at this point solely because Universal Waste spent all these years blocking the Department's forward efforts in one way or another." (*Id.* at 3).

NYSDEC and Plaintiff entered into an Order on Consent and Administrative Settlement for the Universal Waste Site in November 2012 (the "2012 Consent Order"). (Dkt. No. 258-10). Pursuant to the 2012 Consent Order, Plaintiff agreed to conduct a "limited on-Site Remedial Investigation" of the Site. (*Id.* at 2–6).

**10.     2015 Consent Order and Subsequent Site Activity**

Plaintiff and NYSDEC entered into another Order on Consent and Administrative Settlement for the Universal Waste Site in October 2015 (the "2015 Consent Order"). (Dkt. No. 258-15). Plaintiff agreed to perform an RI/FS at the Universal Waste Site and perform IRMs at the Universal Waste Site. (*Id.* at 5). In September 2016, NYSDEC approved the Limited On-Site Remedial Investigation Report that Plaintiff submitted pursuant to the 2012 Consent Order and, based on Plaintiff's representation that the approved RI/FS work plan would be carried out pursuant to the 2015 Consent Order, terminated the 2012 Consent Order. (Dkt. No. 264-4, at 2).

Consultant EHS Support prepared an "Interim Remedial Measure Construction Completion Report – Revision 1" dated March 2019 which summarizes the implementation of IRMs at the Universal Waste Site. (Dkt. No. 258-16). The report "document[ed] the removal and off-site disposal of seventeen (17) debris piles and a soil berm" as an IRM at the Universal Waste Site. (*Id.* at 8). The debris piles and soil berm "were removed to facilitate completion of

the surface and subsurface investigation required as part of the RI/FS" under the 2015 Consent

Order. (*Id.*). The report noted that PCBs "have been identified and are a constituent of potential

concern" for "Site soil." (*Id.*). As part of the IRM, 13,393 tons of hazardous soil and debris were

transported for off-Site disposal. (*Id.* at 16). Work has continued at the Universal Waste Site.

(*See generally* Dkt. No. 264-5 (July 2020 EHS Support report entitled "Supplemental Remedial

Investigation Work Plan for Operable Units 1 and 3 – Revision 1")).

> **B.    Procedural History**

Prior to commencement of this action, Plaintiff and National Grid entered into two

separate agreements which tolled the statute of limitations from June 1, 2015 to June 1, 2016 and

then from July 15, 2016 to December 30, 2016. (Dkt. Nos. 251-2, 251-3). Plaintiff and SMC also

entered into a tolling agreement which tolled the limitations period from December 7, 2015 to

October 31, 2016. (Dkt. No. 251-4). Plaintiff commenced this action against Defendant National

Grid on December 22, 2016. (Dkt. No. 1). On December 10, 2018, Plaintiff filed an amended

complaint and brought suit against SMC, GE, ERC, and CP. (Dkt. Nos. 42, 43). National Grid

brought a third-party complaint against CBS on January 31, 2019. (Dkt. No. 69).

> **C.    Facts Relating to Defendants' Spoliation Motion[9]**

In March 2021, Plaintiff informed Defendants that historic records relating to the Site

were stored in a storage room at Plaintiff's Herkimer, New York location, including

"approximately 300 boxes on pallets." (Dkt. No. 247-1, at 3). Plaintiff later informed the Court

that it "reviewed more than 700 large bankers boxes from the 1980s through 2010 over the

course of six days" and identified "69 historic invoices" relevant to this litigation. (Dkt. No. 213,

---

[9] These facts are largely drawn from the declaration of Attorney Hennessey, counsel to National Grid, to the extent those facts have not been disputed, and other evidence in the record including deposition testimony. (Dkt. Nos. 247, 248, 249, 250, 251). Although Defendants' submissions refer to numerous alleged discovery violations on the part of Plaintiff, the Court focuses its recitation of facts and analysis to the destruction of documents at issue.

at 2). Concerned about Plaintiff's "apparent perfunctory review of the Herkimer storage room," Defendants requested that the Court grant them direct access to the room to conduct their own review. (Dkt. No. 247, ¶ 31 (citing Dkt. Nos. 211, 212)). After a conference and in accordance with the proposal of Magistrate Judge Andrew T. Baxter, Defendants served a Notice of Rule 30(b)(6) Deposition to take the deposition of an individual who could testify about the operations and document removal practices at the Herkimer storage room, the nature of the documents stored in the room, and the document review process carried out by Plaintiff there. (Dkt. No. 247, ¶¶ 32–37; Dkt. No. 247-3).

On July 15, 2021, Defendants deposed William Kinsella, Assistant Comptroller for Plaintiff, who works in Herkimer. (Dkt. No. 247-4 (7/15/2021 Kinsella deposition transcript)).[10] While Mr. Kinsella was not present for and therefore could not testify as to Plaintiff's recent review of documents in the Herkimer storage room, (*see id.* at 27–30), he testified as to the transfer of documents from other locations to the Herkimer storage room and the storage and preservation of documents in Herkimer, (*id.* at 16–24). When asked if he was aware of any documents being destroyed since their arrival in Herkimer, Mr. Kinsella testified that, in or around 2013, "[t]here were pallets from . . . the warehouse, the storage facilities, and Germany [presumably referring to a representative of Plaintiff's German corporate owner] went through them and deemed some of them not of any relevance." (*Id.* at 25). Mr. Kinsella accompanied the German representative to the storage room but could not identify the individual. (*Id.* at 37). Mr. Kinsella did not know "what was in the boxes" that were marked for destruction and ultimately "sent out," and he testified that "100 [boxes], more towards that number than a couple" were

---

[10] Prior to this deposition, two counsel for Defendants "walk[ed] through the storage room, accompanied by Plaintiff's counsel." (Dkt. No. 247, ¶ 43). The walk-through "revealed that boxes appeared to be primarily labeled and organized according to date," including "several boxes" that were clearly labeled "2008 Transaction." (*Id.* ¶¶ 43–44).

destroyed. (*Id.* at 38–39; *see also id.* at 51 (testifying that it "[c]ould be" that between 30 and 50 boxes were destroyed)).

In September and October 2021, defense counsel spent eight days "reviewing the 700+ boxes of historic documents in the Herkimer storage room that remained." (Dkt. No. 247, ¶ 70). During this review, defense counsel located the invoice and associated records for the document destruction Mr. Kinsella referenced. (*Id.* ¶ 73).[11] The invoice and associated records indicate that Plaintiff utilized the services of ConfiData in March 2014 to shred 23,020 pounds of paper. (*See generally* Dkt. No. 247-12).[12] After further conferences and Plaintiff's inability or failure to identify the German representative referenced in Mr. Kinsella's testimony, Magistrate Judge Baxter ordered additional depositions relating to the maintenance of records in the Herkimer storage room and any culling of those records since 2008, including the culling of records in March 2014. (*See* Dkt. No. 247, ¶¶ 78–86). Defendants conducted a second Rule 30(b)(6) deposition of Mr. Kinsella, deposed fact witness Fred Schweizer, and conducted a Rule 30(b)(6) deposition of Alfred Bongers in January 2022. (Dkt. Nos. 248, 249, 250).

At his second deposition, Mr. Kinsella testified that he had never seen a company "document retention" or "document destruction policy." (Dkt. No. 248, at 7–8). Plaintiff's employees began transferring records that had been stored at the Site or in storage units to Herkimer in 2012 and completed the process over a couple of months. (*Id.* at 8). Mr. Kinsella testified that "any records regarding Universal Waste or Utica Alloys would be located in the

---

[11] Attorney Hennessey also states that defense counsel discovered "more than 15,000 pages of relevant information," including "historic operating records, shipping and transportation documents, business transaction documents . . . , [and] environmental and remedial action documents." (*Id.* ¶¶ 74–75 (emphasis omitted)). Defense counsel were not able to locate the boxes labeled "2008 Transaction." (*Id.* ¶ 77).

[12] According to ConfiData's website, a standard full "letter-size banker's box will range from 30–35 pounds" while a standard "legal-sized" box "will range from 45–50 pounds." "Secure Shredding Services Frequently Asked Questions," ConfiData, https://www.confidata.com/about/faqs/ (last visited Nov. 9, 2022). Thus, the 23,020 pounds destroyed are the equivalent of 460–767 banker's boxes.

SPA-25

Herkimer storage room" and that, to his knowledge, no documents from the Site or the two storage units were destroyed before they were moved to the Herkimer storage room. (*Id.* at 8, 10). Mr. Kinsella "organized" the Herkimer storage room by putting boxes on shelving by year. (*Id.* at 10). Plaintiff also "installed a fob system . . . so that it could be controlled as to who went in and out" of the storage room, but there were "no sign-in or sign-out sheets." (*Id.*). There are not "measures in place to record or track" any removal of documents from the storage room. (*Id.*). Mr. Kinsella again testified that a representative from Germany came to Herkimer and "instructed [him] to destroy certain boxes" that "would have come from the [Site] or the two storage units." (*Id.* at 15). Mr. Kinsella agreed, based on the March 2014 ConfiData invoice, that "hundreds of boxes" were destroyed. (*Id.* at 17). He testified that he did not know what was in the boxes that were shredded or why the boxes were destroyed, but noted that "[w]e were just looking to make room." (*Id.*).

Defendants next deposed Fred Schweizer, who was Vice President of Operations for Plaintiff at the relevant time. (Dkt. No. 249). Mr. Schweizer testified that when documents were transferred to the Herkimer storage room, the files of then-Chief Financial Officer Bob Carbone were kept "separate" from the "Inventory boxes." (*Id.* at 11). He also testified that the transfer of documents from the two storage units occurred after "Bob's boxes went to ConfiData." (*Id.*). Mr. Schweizer emailed Alfred Bongers, Plaintiff's head of internal audit, on November 7, 2013, asking whether he could shred Mr. Carbone's "old files going back to [the] 1970's." (*Id.* at 12, 61). Mr. Bongers reached out to Plaintiff's outside auditors to ask about the "legal requirement for storage of old historical files," and the auditors responded with a "list for record retention for businesses." (*Id.* at 62–63). The list, which Mr. Bongers passed on to Mr. Schweizer and Mr. Carbone, generally encompassed three categories: (1) business records which must be kept

forever, including "[l]egal records"; (2) business records which must be kept for six years, such as "[b]ank reconciliation and cancelled checks" and purchase and sales records; and (3) business records which must be kept for three years, such as monthly financial statements and credit card statements. (*Id.*). Mr. Schweizer then "went through each" of Mr. Carbone's boxes of files, which contained "checking, bank statements, and canceled checks and stuff like that." (*Id.* at 12). Mr. Schweizer testified that he was "aware of" the "environmental situation" and knew that "nothing should be thrown away that had anything to do with the environmental situation." (*Id.*). Mr. Schweizer did not keep an index of the boxes he reviewed and spent between five and 30 minutes reviewing each box. (*Id.* at 13, 16). He estimated that he "segregated for destruction" between 12 and 20 boxes. (*Id.* at 16; *see also id.* at 19–20 (testifying that he *kept* 12–20 boxes and that the pile segregated for destruction was "[b]igger")). He "never found anything that was environmentally in any of [the boxes]" and so "basically it was whether they were six years or younger." (*Id.* at 18).

Finally, Defendants deposed Mr. Bongers, head of internal audit of ELG Haniel GmbH. (Dkt. No. 250). Mr. Bongers generally did not have personal knowledge of document storage in the Herkimer storage room or any document destruction. All three deponents agreed that Plaintiff does not have a written policy on document retention or destruction. (Dkt. No. 248, at 11 (Kinsella); Dkt. No. 249, at 9 (Schweizer); Dkt. No. 250, at 39–40 (Bongers)). However, they testified that Plaintiff has an "informal" policy to never destroy documents. (*See* Dkt. No. 249, at 9 (Schweizer testifying: "Basically their policy was not to destroy anything but there was no official policy."); Dkt. No. 250, at 40 (Bongers testifying: "We have an unwritten policy which simply says don't throw anything away.")). Plaintiff has never instituted a litigation hold. (*See* Dkt. No. 248, at 11; Dkt. No. 249, at 15–16; Dkt. No. 250, at 81).

SPA-27

### III.   DEFENDANTS' REQUEST FOR SPOLIATION SANCTIONS

Defendants move for an order sanctioning Plaintiff for spoliation of evidence and request that Plaintiff's amended complaint be dismissed in its entirety or, in the alternative, an adverse inference that "the destroyed documents would have further supported" Defendants' defenses and a preclusion order preventing Plaintiff from offering evidence to "contradict the available remaining historical record" in support of those defenses. (Dkt. No. 246, at 2; *see* Dkt. No. 246-1, at 23–39). Defendants also seek an award of damages because Plaintiff's alleged spoliation has "caused them to incur significant and unnecessary costs and fees." (Dkt. No. 246-1, at 25). Plaintiff generally responds that it had no obligation to preserve the documents that were destroyed in March 2014 and that Defendants can only speculate that the documents are relevant. (*See* Dkt. No. 264-6, at 19–32).

#### A.   Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). A party seeking sanctions based on spoliation must establish, by a preponderance of the evidence: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012)). A district court has authority to "impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106–07 (2d Cir. 2002). The "choice of an

appropriate remedy for spoliation 'is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis.'" *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 580 (S.D.N.Y. 2017) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).

**B.    Discussion**

**1.    Duty to Preserve the Evidence**

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu*, 247 F.3d at 436. "Pursuant to this obligation, anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary." *Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*, 248 F.R.D. 126, 144 (S.D.N.Y. 2007) (citation and internal quotation marks omitted). The scope of the duty to preserve "extend[s] to any documents . . . made by individuals 'likely to have discoverable information that the disclosing party may use to support its claims or defenses.' . . . The duty also extends to information that is relevant to the claims or defenses of *any* party, or which is 'relevant to the subject matter involved in the action.'" *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217–18 (S.D.N.Y. 2003) ("*Zubulake IV*") (quoting Fed. R. Civ. P. 26).

Here, Defendants argue that Plaintiff's "obligation to preserve Site-related documents arose long before the destruction in March 2014," given that Plaintiff had "long been embroiled in an administrative enforcement dispute" with NYSDEC, had entered into multiple consent orders with NYSDEC including as recently as November 2012, had received the 2012 Notice Letter, and was awaiting a state-court decision on its challenge to NYSDEC's decision upholding the Universal Waste Site's Class 2 registration. (Dkt. No. 246-1, at 26–27). Plaintiff responds that (1) its duty to preserve evidence arose "at the earliest" "sometime after February 23, 2015,

26

SPA-29

when [Plaintiff] recognized that it would need to pursue litigation against Defendants for contribution" and (2) any duty to preserve evidence did not extend to the records that were destroyed in March 2014, which Plaintiff terms "Accounting Records." (Dkt. No. 264-6, at 20–21).

The Court concludes that Plaintiff had a duty to preserve evidence relevant to possible future litigation among the parties relating to the Site long before the document destruction in March 2014. The 2012 Notice Letter expressly informed Plaintiff that the NYSDEC had identified it as a "responsible party for the site's contamination" and that the Department was sending Notice Letters to other PRPs, including Defendants SMC and National Grid. (Dkt. No. 258-7, at 2–3). The 2012 Notice Letter requested that Plaintiff "develop, implement, and finance a Remedial Program for th[e] site." (*Id.*). In response, Plaintiff requested copies of the Notice Letters sent to other PRPs. (Dkt. No. 258-8, at 3). Moreover, the 2012 Consent Order, pursuant to which Plaintiff agreed to conduct a remedial investigation, expressly states that Plaintiff reserved "such rights as it may have," including under CERCLA, "to seek and obtain contribution, indemnification, and/or any other form of recovery . . . from other potentially responsible parties . . . for past or future response and/or cleanup costs." (Dkt. No. 258-10, at 9). These developments, especially when viewed in light of the lengthy history of known contamination, administrative involvement, and response actions at the Site, made litigation among the parties reasonably foreseeable prior to the document destruction at issue in March 2014.[13] *Cf. Arrowood Indem. Co. v. Bel Air Mart*, No. 11-cv-976, 2014 WL 841314, at *7, 2014 U.S. Dist. LEXIS 27627, at *19 (E.D. Cal. Mar. 4, 2014) (positing that knowledge of building

---

[13] The Court also notes that, when SMC filed for bankruptcy in 2002, the Companies and Clearview filed claims in the bankruptcy proceeding regarding expenses incurred in addressing contamination at the Site. (*See* Dkt. No. 251-5).

contamination "might have placed [the defendant] on notice of a potential CERCLA action," but not an insurance coverage action). Plaintiff's argument that its obligation to preserve evidence arose *after* it threatened other PRPs with litigation is unavailing. (*See* Dkt. No. 251-1, at 3 (February 23, 2015 letter seeking to "achieve an equitable approach to share" site costs "on an interim basis so as to avoid expensive and protracted litigation"), 4 ("ELGUA will pursue cost recovery against [Responsible Parties] that will not participate on a reasonable basis.")).

      The Court further concludes that Plaintiff's obligation to preserve evidence encompassed the documents that were destroyed by ConfiData in March 2014. While Plaintiff correctly points out that an obligation to preserve does not require a corporation to "preserve every shred of paper," *Zubulake IV*, 220 F.R.D. at 217, the sheer volume of paper destroyed in March 2014 strongly suggests that Plaintiff destroyed more than simply "canceled checks, bank statements, checks and balances, equipment purchase orders, and other miscellaneous bookkeeping materials," (Dkt. No. 264-6, at 21–22). Plaintiff's argument relies on the testimony of Mr. Schweizer, who states that he went through Mr. Carbone's boxes of files and decided what to retain and what to destroy. However, Mr. Schweizer reviewed Mr. Carbone's boxes himself, without any legal guidance and relying solely on Plaintiff's outside accountant's list of documents to retain, which did not mention environmental matters. Mr. Schweizer also testified that he spent between only five and 30 minutes reviewing a box. It is therefore exceedingly likely that the destroyed documents were not merely the type of "Accounting Records" described by Plaintiff. More importantly, however, Mr. Schweizer's testimony does not account for the undisputed destruction of over 23,000 pounds of documents, the equivalent of 460–767 banker's boxes. (*See* Dkt. No. 249, at 19–20 (testifying that the pile of documents segregated for destruction was "[b]igger" than 12–20 boxes)). Nor does it explain Mr. Kinsella's consistent

testimony that a German representative ordered the destruction of certain documents, and that it was these documents that were destroyed in March 2014.[14] Thus, the Court finds that Plaintiff had an obligation to preserve the documents destroyed in March 2014.

### 2.    Culpability

A party may establish a culpable state of mind by "showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or negligently.'" *Residential Funding Corp.*, 306 F.3d at 108 (emphasis and citation omitted). "Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." *Zubulake IV*, 220 F.R.D. at 220 (footnote omitted).

Here, it is undisputed that Plaintiff knowingly destroyed the documents at issue in March 2014. Plaintiff also never instituted a litigation hold at any point to ensure the preservation of relevant evidence pertaining to its claims, including to date. *See Chin*, 685 F.3d at 162 (rejecting the argument that "failure to institute a 'litigation hold' constitutes gross negligence *per se*" but acknowledging that "the failure to adopt good preservation practices" is a relevant factor). Plaintiff has failed to implement reasonable measures to preserve and protect relevant documents: it maintains no logs or indexes of its documents or what documents are destroyed, and it has no system for tracking any documents which are removed from the Herkimer storage room. To the extent the March 2014 document destruction is in part the result of Mr. Schweizer's review of Mr. Carbone's files, Mr. Schweizer relied on a list from an outside accountant which did not adequately address documents which might be relevant to this litigation, and no index or log of which files were destroyed was created. Finally, it is undisputed that the March 2014

---

[14] Indeed, Plaintiff's opposition fails to address the testimony regarding the German representative's involvement at all.

SPA-32

document destruction occurred in violation of Plaintiff's unwritten or informal document

retention policy to never destroy documents. *Cf. Dataflow, Inc. v. Peerless Ins. Co.*, No. 11-cv-

1127, 2013 WL 6992130, at *7, 2013 U.S. Dist. LEXIS 183398, at *20 (N.D.N.Y. June 6, 2013)

(noting that the defendant's "deletion of th[e] e-mails was in direct violation of the record

retention policy in place at [the defendant company] at the time of Dataflow's claim"), *report-

recommendation adopted in relevant part*, 2014 WL 148685, 2014 U.S. Dist. LEXIS 3882

(N.D.N.Y. Jan. 13, 2014). The Court finds that, under all of these circumstances, Plaintiff's

failure to preserve evidence constituted, at a minimum, gross negligence. *Cf. id.*, 2013 WL

6992130, at *7, 2013 U.S. Dist. LEXIS 183398, at *19–20 (finding the defendant's failure to

preserve evidence grossly negligent where the defendant did not implement a litigation hold,

failed to take steps to preserve relevant evidence, and violated its record retention policy).

> **3.  Relevance**

Finally, a party seeking sanctions for spoliation must demonstrate that the destroyed

evidence was "relevant" to its claims or defenses. At least where more severe sanctions are at

issue, "'relevant' in this context means something more than sufficiently probative to satisfy

Rule 401 of the Federal Rules of Evidence." *Residential Funding Corp.*, 306 F.3d at 108–09.

"Rather, the party seeking an adverse inference must adduce sufficient evidence from which a

reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been

of the nature alleged by the party affected by its destruction.'" *Id.* at 109 (quoting *Kronisch v.

United States*, 150 F.3d 112, 127 (2d Cir. 1998)); *see also Zubulake v. UBS Warburg LLC*, 229

F.R.D. 422, 431 (S.D.N.Y. 2004) ("*Zubulake V*") ("In the context of a request for an adverse

inference instruction, the concept of 'relevance' encompasses not only the ordinary meaning of

the term, but also that the destroyed evidence would have been favorable to the movant.").

However, "[c]ourts must take care not to hold the prejudiced party to too strict a standard of

SPA-33

proof regarding the likely contents of the destroyed or unavailable evidence, because doing so would subvert the purposes of the adverse inference, and would allow parties who have destroyed evidence to profit from that destruction." *Residential Funding Corp.*, 306 F.3d at 109 (citation, internal quotation marks, brackets, and ellipses omitted). In some circumstances, a party's gross negligence will suffice "to support a finding that the evidence was unfavorable to the grossly negligent party." *Id.*

Here, while Plaintiff's gross negligence alone may support a presumption that the destroyed documents are relevant, the Court concludes that there is sufficient evidence from which a reasonable factfinder could conclude that the destroyed documents would be relevant and favorable to Defendants. First, it is undisputed that the destroyed documents relate to the Site and are from the time period at issue. Second, as discussed in greater detail above, there are concerns about the adequacy of Mr. Schweizer's review of Mr. Carbone's files, Plaintiff's failure to explain the undisputed destruction of 23,020 pounds of documents, and the lack of any record of what was destroyed. Moreover, Defendants assert that even Mr. Carbone's "accounting" or "bookkeeping" files were relevant to their defenses, as those files included "old financial records" concerning "operations" at the Site. (Dkt. No. 246-1, at 33). The Court agrees that canceled checks, purchase orders, and payment records are relevant to Defendants' statute of limitations and statutory scrap recycling defenses. Defendants have also identified other types of business records that Plaintiff likely would have maintained "reflecting the day-to-day operations" at the Site which are relevant to their defenses. (*Id.* at 34–36). These records would contain information relating to, among other things, the source, quantity, and value of scrap metal received by Plaintiff, payments made by Plaintiff for that metal, Plaintiff's protocol for

31

"inspecting, handling, and cleaning scrap materials," and regulatory compliance. (*Id.*).[15] Finally, although Plaintiff argues that relevant inventory documents "were never removed from Herkimer," (Dkt. No. 264-6, at 28–29), Defendants have represented that there is a "conspicuous gap in the documentary records regarding Universal Waste's operation of the Site," but no corresponding gap in the Utica Alloys records. (Dkt. No. 246-1, at 36; *see also, e.g.*, Dkt. No. 247, ¶ 76; Dkt. No. 252, ¶¶ 5, 10).

Plaintiff nonetheless argues that "many of the purportedly missing documents would be in Defendants' possession" and that Defendants therefore suffered no prejudice by the document destruction. (Dkt. No. 264-6, at 29). However, the Court agrees with Defendants that they "are in a fundamentally different posture" and were not on "notice for decades of the need to preserve documents concerning the Site." (Dkt. No. 265, at 18). Furthermore, Defendants would not necessarily have records concerning other PRPs, Plaintiff's recycling operations, or remedial activities. (*See id.*).

Accordingly, the Court concludes that Defendants have satisfied their burden of showing that the destroyed documents are relevant.

**4.      Choice of Sanction**

Defendants argue that Plaintiff's spoliation warrants dismissal of all of its claims. (Dkt. No. 246-1, at 37). In the alternative, Defendants request an adverse inference that "the destroyed documents would have further supported their statute of limitations and statutory scrap recycling defenses" and a "preclusion order that prevents Plaintiff from offering any evidence to contradict

---

[15] In the event of a finding of liability, such evidence would also be relevant to the Court's apportionment of responsibility among liable parties. *See* 42 U.S.C. § 9613(f)(1).

the available remaining historical record in support of those defenses." (Dkt. No. 246, at 2).
Finally, Defendants request an award of "damages, including attorneys' fees and costs." (*Id.*).

Sanctions for spoliation of evidence should aim to accomplish three goals: "(1) deter
parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who
wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would
have been in absent the wrongful destruction of evidence by the opposing party.'" *West*, 167
F.3d at 779 (quoting *Kronisch*, 150 F.3d at 126). "It is well accepted that a court should always
impose the least harsh sanction that can provide an adequate remedy. The choices include—from
least harsh to most harsh—further discovery, cost-shifting, fines, special jury instructions,
preclusion, and the entry of default judgment or dismissal (terminating sanctions)." *Dorchester
Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014) (citation omitted).

"[T]he Second Circuit has endorsed four factors for a district court to consider in
exercising its discretion to impose sanctions pursuant to Rule 37: '(1) the willfulness of the
noncompliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the
duration of the period of noncompliance, and (4) whether the non-compliant party had been
warned of the consequences of noncompliance.'" *Syntel Sterling Best Shores Mauritius Ltd. v.
TriZetto Grp.*, 328 F.R.D. 100, 120 (S.D.N.Y. 2018) (quoting *S. New England Tel. Co. v. Glob.
NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010)). A district court is free to consider "the full record
in the case in order to select the appropriate sanction." *S. New England Tel. Co.*, 624 F.3d at 144
(citation omitted).

At this point, in light of the Court's ruling below granting Defendants' motion for
summary judgment as to Plaintiff's CERCLA claims, the Court will request a status report

and/or letter briefing from the parties regarding how they seek to proceed regarding the issue of sanctions. *See infra* Section V.

## IV.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As relevant to Defendants' summary judgment motion, the amended complaint asserts (1) a CERCLA Section 107 claim, (2) a CERCLA Section 113(f)(1) claim, and (3) a claim for a declaratory judgment allocating future Site-related costs and damages pursuant to CERCLA Section 113(g)(2). Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that Plaintiff's Section 107 claim is barred by the statute of limitations, Plaintiff cannot state a viable Section 113(f)(1) claim, and Plaintiff's declaratory judgment claim must be dismissed in the absence of a viable CERCLA claim. (Dkt. No. 246-1, at 39–55).

### A.   Standard of Review

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where

the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

**B.     CERCLA Section 107 Claim**

Count I of the amended complaint seeks cost recovery under Section 107 of CERCLA, which allows a party to "seek reimbursement for all removal or remedial costs associated with the hazardous materials on the property." *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120–21 (2d Cir. 2010) (internal footnote omitted); *see* 42 U.S.C. § 9607(a) (providing that, among others, "the owner and operator of a vessel or a facility" and "any person who by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous

substances owned or possessed by such person, by any other party or entity, at any facility"
"shall be liable for" "any other necessary costs of response incurred by any other person
consistent with the national contingency plan"). Defendants move for summary judgment on
Plaintiff's Section 107 claim, arguing that the claim is time-barred as to all Defendants because
Plaintiff initiated physical on-site construction of the remedial action at the Site before June 1,
2009—more than six years before Plaintiff entered into any tolling agreement or initiated this
action. (Dkt. No. 246-1, at 39–50). Plaintiff responds that its Section 107 claim is timely and
accrued in 2015 because (1) its prior response actions were removal actions, not remedial, and
(2) even if its prior actions were remedial, the single-remediation principle does not apply in this
case. (Dkt. No. 264-6, at 32–46).

"For cost recovery actions under § 107, CERCLA 'distinguishes between two kinds of
response: remedial actions—generally long-term or permanent containment or disposal
programs—and removal efforts—typically short-term cleanup arrangements.'" *Schaefer v. Town
of Victor*, 457 F.3d 188, 195 (2d Cir. 2006) (quoting *New York v. Shore Realty Corp.*, 759 F.2d
1032, 1040 (2d Cir. 1985)). "The statute of limitations for the recovery of costs related to
'removal actions' is three years after the completion of the removal action . . . while the
limitations period for the recovery of costs related to 'remedial actions' is six years after the
initiation of physical on-site construction of the remediation." *Id.*; *see* 42 U.S.C. § 9613(g)(2).
Thus, to determine which statute of limitations applies, the Court must determine whether the
response actions at issue were removal or remedial. This is a question of law. *NYSEG*, 766 F.3d
at 230.

1.      **Nature of Response Actions**

CERCLA defines "removal" action as:

SPA-39

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). It defines "remedial action" as:

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

*Id.* § 9601(24). The term "remedial action" includes "offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials." *Id.*

While the "statutory definitions do not provide clear insight as to the boundary between removals and remediations," "courts have agreed on a general principle to distinguish the two: removal actions are generally clean-up measures taken in response to immediate threats to public health and safety that address contamination at its endpoint, while remedial actions are typically actions designed to permanently remediate hazardous waste that address contamination at its source." *MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200, 219 (2d Cir. 2020) (quoting *NYSEG*, 766 F.3d at 230–31) (internal quotation marks and brackets omitted). The "key distinction" between removal and remedial actions is "immediacy and comprehensiveness." *Id.* (citation omitted). Generally, removal actions are undertaken to deal with threats requiring an "immediate response" and target the "deleterious *effects* of contamination," rather than "eliminat[ing] or permanently contain[ing] the *source* of contamination." *Id.* Removal actions

37

"are often planned and executed relatively quickly in order to immediately abate public health hazards." *Id.* at 220; *see also New York v. Next Millenium Realty, LLC*, 732 F.3d 117, 126 (2d Cir. 2013) (noting that a "defining characteristic of removal actions" is that they are taken "in response to an imminent public health hazard"). Remedial actions, by contrast, are undertaken "to permanently remediate contamination, generally after months (if not years) of correspondence with regulators," testing, analysis, and feasibility studies. *MPM*, 966 F.3d at 220 (citing 40 C.F.R. § 300.430(a)(2)). Remedial actions "typically address 'the underlying source of the contamination.'" *Id.* (quoting *NYSEG*, 766 F.3d at 236).

Here, Defendants argue that the Companies "initiated construction of at least three significant 'remedial' actions in 1979, 2002, and 2007," any one of which renders Plaintiff's Section 107 claim untimely. (Dkt. No. 246-1, at 44). Plaintiff responds that it did not initiate any remedial action at the Universal Waste Site until 2015 and that the response actions Defendants identify were removal actions designed as "interim or temporary solution[s] to specific contamination issues at the Site." (Dkt. No. 264-6, at 34).

### a.      Identification of the Facility

As an initial matter, Defendants argue that the CERCLA "facility" at issue in this case should be defined as the full, 23-acre Site, not simply the Universal Waste Site. (Dkt. No. 246-1, at 40–42). Plaintiff responds that the Universal Waste Site and Utica Alloys Site have "already been divided" by NYSDEC and should be considered separate facilities under CERCLA. (Dkt. No. 264-6, at 39–40).

"CERCLA defines the term 'facility' broadly to include any property at which hazardous substances have come to be located." *Shore Realty Corp.*, 759 F.2d at 1043 n.15 (citing 42 U.S.C. § 9601(9)). The term "facility" in CERCLA:

means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

"[A] contaminated site that is or was managed as a whole constitutes a single facility for CERCLA purposes . . . [and] a widely contaminated area should not unnaturally be divided into multiple facilities in order to limit a party's liability." *Alprof Realty LLC v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, No. 09-cv-5190, 2012 WL 4049800, at *8, 2012 U.S Dist. LEXIS 131046, at *22–23 (E.D.N.Y. Sept. 13, 2012) (collecting cases); *see PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 178–79 (4th Cir. 2013) ("Courts have uniformly refused to divide widely contaminated properties . . . into separate facilities in response to a party's claim to be responsible for contamination in only certain parts of the property.") (citation omitted). But "where parcels are naturally divisible into parts or functional units, they should not be considered as a single facility." *Niagara Mohawk Power Corp. v. Consol. Rail Corp.*, 291 F. Supp. 2d 105, 125 (N.D.N.Y. 2003) (citing *United States v. 150 Acres of Land*, 204 F.3d 698, 709 (6th Cir. 2000)), *rev'd in part on other grounds*, 596 F.3d 112 (2d Cir. 2010).

Courts have often recognized the boundaries of a facility as being defined partly by the areas that were contaminated by a common source. *See Yankee Gas Servs. Co. v. UGI Utils., Inc.*, 616 F. Supp. 2d 228, 270–71 (D. Conn. 2009) ("[A] site with a single source of pollution is almost always considered one 'facility' within the meaning of CERCLA and is generally not divisible absent extraordinary circumstances." (citations omitted)); *Durham Mfg. Co. v. Merriam*

*Mfg. Co.*, 294 F. Supp. 2d 251, 267 (D. Conn. 2003) (holding that Superfund site could not be divided for liability purposes where plaintiff could not establish that there were "separate and distinct plumes of ground-water contamination" within the site); *New York v. Westwood-Squibb Pharm. Co., Inc.*, 138 F. Supp. 2d 372, 379 (W.D.N.Y. 2000) (holding that two properties, which had been aggregated into one National Priorities List site by EPA, were part of the same facility when they had a common source of contamination); *see also 150 Acres of Land*, 204 F.3d at 709 ("The words of the statute suggest that the bounds of a facility should be defined at least in part by the bounds of the contamination. However, an area that cannot be reasonably or naturally divided into multiple parts or functional units should be defined as a single 'facility,' even if it contains parts that are non-contaminated." (quoting *United States v. Township of Brighton*, 153 F.3d 307, 313 (6th Cir. 1998) (ellipses omitted))).

Courts also look to whether the areas in question were jointly managed or operated. *See 150 Acres of Land*, 204 F.3d at 709 (holding that division of property into three parcels did not constitute a "reasonable or natural" division, and that all parcels were part of the same CERCLA facility); *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 191 F.3d 409, 419 (4th Cir. 1999) (holding that entire property was a single facility where it "was at all relevant times operated by a single party, and both the EPA and Axel itself treated the entire property as a single facility for CERCLA remediation purposes in the consent decree that they signed"); *Township of Brighton*, 153 F.3d at 313 (considering the fact that "the entire property was operated together as a dump" when determining that it constituted a single facility); *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 843 (4th Cir. 1992) (holding that site was divisible into separate facilities where it "was subdivided and separate portions of it were leased out to individual tenants").

SPA-43

Here, the Court concludes that the full Site is a single facility for CERCLA purposes. The Universal Waste and Utica Alloys Sites have shared common ownership, control, and management since at least 1984. (*See* Dkt. No. 252-10 (1984 indenture transferring the property to Clearview and 1984 leases of the property to the Companies)); *see supra* Section II.A.7 (detailing 2008 sale of property to Plaintiff). It is undisputed that the Companies "had the same voting stockholder, officers, and directors, used the same buildings and areas at the Site, and shared Site costs." (Dkt. No. 246-2, ¶ 3; Dkt. No. 264, ¶ 3). This common ownership and management weigh in favor of finding a single facility. *Cf. Cooper Crouse-Hinds, LLC v. City of Syracuse*, 568 F. Supp. 3d 205, 234 (N.D.N.Y. 2021) (noting that "[c]ourts routinely look to whether the areas in question were jointly managed or operated"). Moreover, the PCB and TCE contamination at issue extends throughout the 23-acre Site and results from the same sources. *Cf. Yankee Gas Servs. Co.*, 616 F. Supp. 2d at 270–71; *Durham Mfg. Co.*, 294 F. Supp. 2d at 267. Finally, NYSDEC investigated the Site as a single site for approximately twenty years and listed it on the registry as such. *Cf. Cooper Crouse-Hinds*, 568 F. Supp. 3d at 234–35 (finding that two landfills constituted a single facility where they were "operated and managed for a singular purpose" for over 75 years and New York State had "addressed the North and South Landfills unitarily" as a single site).

Although Plaintiff argues that the Site is "reasonably [and] naturally divided" into the Utica Alloys and Universal Waste Sites, (Dkt. No. 264-6, at 39–40), the administrative bifurcation of the Site is not determinative. *Cf. New York v. Gen. Elec. Co.*, No. 14-cv-747, 2017 WL 1239638, at *21, 2017 U.S. Dist. LEXIS 50026, at *58–59 (N.D.N.Y. Mar. 31, 2017) ("The fact that the State, in 1990 began to list the two properties as one Site in the Registry does not require a different finding, as the State's designation of the two properties as one 'facility' does

41

not make it so."); *cf. Am. Premier Underwriters Inc. v. Gen. Elec. Co.*, 866 F. Supp. 2d 883, 895 (S.D. Ohio 2012) (noting that operable unit "divisions of a site may or may not correspond to the geographic bounds of the 'facility,' as that term is defined in CERCLA"); *cf. PCS Nitrogen Inc.*, 714 F.3d at 178 (noting that the definition of facility "is not predicated . . . on the area targeted for remediation"). It is notable the state administrative bifurcation of the Site happened in 1998, more than 20 years after contamination was first discovered, and only at Plaintiff's request. (*See* Dkt. No. 255-1, at 3 (letter dated April 20, 1994 requesting bifurcation of "the investigation of the Site")). NYSDEC had no objection to a "phased approach" to investigating the Site "utilizing two consent orders" as long as the Department "ha[d] some assurance that the second phase (investigation of the Universal Waste portion of the site) will actually take place in a timely manner." (Dkt. No. 255-3, at 2; *see also* Dkt. No. 255-4, at 2 (internal NYSDEC memorandum noting that "while a full site [assessment] is preferred," Department staff had "agreed" that a proposed assessment "for the Utica Alloys parcel does advance the Department's knowledge of the site conditions")). When NYSDEC bifurcated the Site, it noted that it was doing so "to facilitate an independent remediation" of the Utica Alloys portion. (Dkt. No. 255-13, at 4). The Court concludes that the 1998 administrative bifurcation was more akin to the division of the Site into operable units and a division as convenience. *Cf. Durham Mfg. Co.*, 294 F. Supp. 2d at 267 (finding a single facility and noting that the "historical [administrative] division of the Site" was "a division of convenience and . . . not supported by scientific evidence").

Thus, the Court finds as a matter of law that the 23-acre Site constitutes one CERCLA facility.

SPA-45

### b. 2007 Response Action

As stated above, Utica Alloys excavated 715 tons of PCB- and TCE-contaminated soil and pumped 6,951 gallons of contaminated groundwater for transfer and off-site disposal in December 2007. The Court concludes that this 2007 response action is remedial in nature.[16]

The Court finds that this 2007 response action is more akin to a remedial action than a removal action.[17] First, in line with the statutory definition of a remedial action, the 2007 work was "consistent with [a] permanent remedy." 42 U.S.C. § 9601(24). Plaintiff argues that this work cannot be a remedial action because it was "completed as part of an *interim* remedial measure required by DEC, rather than any sort of final and permanent cleanup." (Dkt. No. 264-6, at 40; *see id.* at 34 (arguing that "remedial work did not begin until 2015 at the earliest when [Plaintiff] began working with DEC on a permanent and final, once-and-for-all cleanup of the Site")). However, IRMs can constitute remedial actions, *NYSEG*, 766 F.3d at 234–35 (noting that "IRMs can either be removal or remedial actions" and finding CERCLA claim time-barred where the cleanup at issue "was part of a larger remedial action"), and the fact that a "final" remedial plan had not been determined at that time is not dispositive, *see Schaefer*, 457 F.3d at 207–09 (rejecting the argument that a remedial action can be initiated only after approval of a final remedial action plan, noting that the "plain language of the statute . . . speaks of 'actions *consistent with* permanent remedy' and nowhere mentions . . . approval of the final remedial

---

[16] Because the Court concludes that the 2007 response action was remedial and that application of the single-remediation principle is appropriate in this case, *infra* Section IV.B.2, the Court does not address the 1979 or 2002 actions. Further, in light of the Court's conclusion that the Site is one facility under CERCLA, *supra* Section IV.B.1.a, the parties' dispute regarding whether the 2007 work was completed solely on the Utica Alloys Site, (*see* Dkt. No. 246-1, at 11–12; Dkt. No. 264-6, at 39–40), is not relevant.

[17] The Court notes that soil excavation and disposal fit within the statutory definitions of both removal actions and remedial actions. 42 U.S.C. § 9601(23) (defining "removal" to include "the disposal of removed material"), 9601(24) (defining "remedial action" to include "offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials"); *cf. Cooper Crouse-Hinds*, 568 F. Supp. 3d at 227–28 (relying on the plain language of the statutory definitions of removal and remedial actions where, unlike here, there was no overlap or "statutory confusion" with regard to the corrective action at issue).

action plan"); *see also Yankee Gas Servs.*, 616 F. Supp. 2d at 276 (noting that the Second Circuit

has rejected the argument that a final remedial action plan is required before the statute of

limitations begins to run on a remedial action (citing *Schaefer*, 457 F.3d at 207)); *accord Cytec*

*Indus., Inc. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 838 (S.D. Ohio 2002) (rejecting

argument that a remedial action cannot begin until a "lead agency" issues "final, written approval

of the remedial design for the site at issue"). Here, the excavation, removal, and off-site disposal

of 715 tons of PCB-contaminated soil are clearly consistent with a permanent remedy for the

PCB contamination at the Site. *Cf. Yankee Gas Servs.*, 616 F. Supp. 2d at 274 (rejecting the idea

that "the removal of 9,000 tons of contaminated soil" would be "inconsistent with the permanent

remedy" and noting that the plaintiffs surely "d[id] not intend to return the contaminated soil to

the site").

Second, the 2007 soil excavation and disposal were aimed at eliminating the source of the

PCB contamination and not at mitigating the deleterious effects of the contamination at its

endpoint. *MPM*, 966 F.3d at 219 (noting that removal actions generally target "reducing the

deleterious *effects* of contamination" but do not "seek to eliminate or permanently contain the

*source* of contamination"); *see id.* at 222–23 (finding that the construction of an earthen cap,

diversion ditch, and interceptor trench were not efforts to "neutraliz[e] contamination 'at its

endpoint'" but were rather "steps to permanently prevent contaminants . . . from migrating away

from their source—*i.e.*, the location of their burial"). The PCB areas that were excavated were

known and did not present an imminent migration threat that needed to be contained; rather, the

2007 response action addressed the PCB contamination at its source. *Cf. Cooper Crouse-Hinds*,

568 F. Supp. 3d at 229 (holding that the construction of check dams "was an immediate action

taken to prevent the migration of contamination further downstream" and therefore a removal

action); *see also Next Millenium Realty*, 732 F.3d at 127 (holding that the construction of a carbon adsorption system and air stripper tower were removal actions where they "were designed as measures to address water contamination at the endpoint—the wells—and not to permanently remediate the problem").

Finally, and significantly, Plaintiff has offered no evidence that the 2007 soil excavation and disposal were conducted to address an imminent threat or emergency situation. *See NYSEG*, 766 F.3d at 234 ("[T]he cleanup was not designed to address an imminent health concern."); *MPM*, 966 F.3d at 219 (noting that the "key distinction" between removal and remedial actions is "immediacy and comprehensiveness" and that removal actions are done to deal with threats requiring an "immediate response"). Rather, the 2007 work addressed the same PCB contamination that was first discovered in 1977 and occurred only after years of planning, investigation, and coordination with NYSDEC. (*See, e.g.*, Dkt. No. 253-7 (1982 NYSDEC letter indicating that it was investigating the Site); Dkt. No. 253-8 (1982 Agreement); Dkt. No. 253-9 (Clayton Study); Dkt. No. 254 (1986 Notion of Motion for Summary Order); Dkt. No. 254-9, at 2–3 (1991 NYSDEC memorandum noting delay and stating that the Site was not an "imminent threat")). The 2007 IRM work was conducted pursuant to the 1999 Consent Order, after a Remedial Investigation and Interim Remedial Measures Alternative Analysis Program was initiated in 1999, and there is record evidence regarding the planning for the 2007 work from 2003. (Dkt. No. 258, at 6; Dkt. No. 256-7). Thus, there is no genuine dispute that the 2007 soil excavation and disposal was not addressed to any imminent public threat but rather occurred after "months (if not years) of correspondence with regulators," investigation, and planning. *MPM*, 966 F.3d at 220.[18]

---

[18] Indeed, Plaintiff repeatedly sought to delay or avoid investigating or remediating the Site, often arguing to NYSDEC that no action should be required. (*E.g.*, Dkt. No. 253-6, at 2 (arguing that the Site presented "no hazardous waste

**SPA-48**

Accordingly, the Court concludes that the 2007 excavation and disposal of PCB- and TCE-contaminated soil occurred on the Site and was remedial in nature.[19] Plaintiff's argument that the work performed at the Universal Waste Site beginning in 2015 was "markedly different" and more "comprehensive," (Dkt. No. 264-6, at 41–42), does not preclude characterization of the 2007 IRM as remedial but rather is more germane to application of the single-remediation principle, which the Court turns to next.

### 2.    Application of the Single-Remediation Principle

Defendants argue that Plaintiff's Section 107 claim is time-barred because, as discussed above, Plaintiff initiated the physical on-site construction of the remedial action more than six years before Plaintiff entered into a tolling agreement with any Defendant or initiated this action and because the costs Plaintiff seeks to recover in this suit relate to that same remedial action under the single-remediation principle. (Dkt. No. 246-1, at 47–49). Plaintiff responds that the Second Circuit recently "clarified that the single remediation principle is unworkable" and that the work undertaken at the Site in 2015 addressed an "expanded range of contaminants." (Dkt. No. 264-6, at 44–45).

In *NYSEG*, the Second Circuit endorsed what was an apparently categorical holding that "there can only be one remedial action at a site." *NYSEG*, 766 F.3d at 236. In *MPM*, however, the court clarified that while the single-remedial principle "is a reliable prescription in the great

---

problem"); Dkt. No. 254-3 (requesting that NYSDEC delist or reclassify the Site in 1986); Dkt. No. 256-5, at 7 (2003 petition to delist or reclassify the Universal Waste Site on the Registry)). And NYSDEC's decision to administratively bifurcate the Site in 1998 was motivated, at least in part, by the agency's desire for Plaintiff to investigate and remediate at least a portion of the 23-acre Site. (*See* Dkt. No. 255-13, at 4).

[19] The Court further notes that Plaintiff characterized the 2007 work as "remedial" to challenge NYSDEC's regulatory fee assessment. (Dkt. No. 258-2, at 2–3 (claiming a fee exemption because the hazardous waste generated by the 2007 excavation and disposal was "generated in the *remediation* of an inactive hazardous waste disposal site" subject to regulatory approval) (emphasis added)). While "generic uses of the word 'remedial'" do not alone "render an action 'remedial' for purposes of the statute of limitations," *Next Millenium Realty*, 732 F.3d at 130–31 (citations omitted), Plaintiff's affirmative representation to NYSDEC that the 2007 work was remedial "does serve to confirm the Court's view that what occurred at the [Site] was a remediation," *Yankee Gas Servs.*, 616 F. Supp. 2d at 272–73.

46

majority of cases," the principle does not control "if the circumstances of a case would render it *illogical* and *unfair*, and would *defeat* the statutory designs or objectives of [the Resource Conservation and Recovery Act ("RCRA")] and CERCLA." 966 F.3d at 226–27; *see also id.* at 227–28 (discussing the statutory purposes of RCRA and CERCLA, describing "cost-recovery as an essential motivator in the RCRA/CERCLA framework" because it incentivizes private parties and regulators "to ensure that cleanups are conscientious and thorough," and observing that "CERCLA's manifest purpose [is] to 'encourag[e] the timely cleanup of hazardous waste sites' by private parties by 'placing the cost of that cleanup on those responsible for creating or maintaining the hazardous condition.'" (quoting *Consolidated Edison Co. of New York, Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005))). For example, application of the single-remediation principle would be "inappropriate" when "the subsequent remediation undertakes to remediate a problem that did not exist at the time of the prior remedial act," where a "site operator discovers a previously unsuspected contamination that was unrelated to, and perhaps far distant from, a previously remediated contamination," or where a party would be "unfairly precluded" from bringing suit. *Id.* at 227. But when "the contamination to be addressed arises from a single source, and the operator undertakes to remedy that 'underlying source of contamination,' the distinct steps taken in furtherance of that objective will constitute a single remediation." *Id.* at 229 (brackets and internal citation omitted). The Second Circuit stated that a "helpful inquiry" would be to "examine whether the recent action (sought by the remediator to be characterized as a new remediation) falls within the remedial scope of the previous remediation as revealed in the record before the regulatory agency." *Id.* at 230.

In sum, the single-remediation principle "means simply and logically that the plaintiff cannot escape the six-year limitation period and endlessly postpone the bringing of suit by

characterizing subsequent phases of the initial project as new remediations." *Id.* at 225. But where a subsequent remediation "seeks to address a different set of problems—*e.g.* problems that were non-existent, unknown, elsewhere, or undisclosed to the regulators and unrevealed in an earlier remediation plan—[the subsequent remediation] should not be considered part of the [first] remediation" and would be entitled to a new six-year statute of limitations. *Id.* at 230.

The Court concludes that application of the single-remediation principle here would not be illogical or unfair because Plaintiff has not pointed to evidence from which a reasonable factfinder could conclude that the contamination being addressed pursuant to the 2015 Consent Order is a new problem that was non-existent, unknown, and/or not reasonably foreseen at the time of the 2007 soil excavation and disposal. It is undisputed that remedial work beginning in 2015 pursuant to the 2012 Consent Order addressed PCB contamination at the Site, (*see* Dkt. No. 258-16, at 8 (2019 report noting that PCBs "have been identified and are a constituent of potential concern (COPC) for Site soil")), and Plaintiff makes no argument that this PCB contamination is not the same PCB contamination that was first discovered in 1977 and which has long been known to NYSDEC. Similarly, while Plaintiff argues that the 2015 remedial work addresses contaminants other than PCBs, such as volatile organic compounds, (Dkt. No. 264-6, at 45), Plaintiff again makes no argument that this is a new, different, or unforeseen problem. Application of the single-remediation principle is therefore logical. *See MPM*, 966 F.3d at 224–25 (finding application of the single-remediation principle appropriate where subsequent remedial steps "were either explicitly foreseen at the start of the remediation" or "at least contemplated"); *id.* at 225 (noting that the plaintiffs in the precedents *NYSEG* relied on in enunciating the single-remediation principle had "at least a general awareness of the contamination problems" at the outset and that the "subsequent stages of response" were either

48

"further steps towards remediating the original problems" or "steps to remediate different aspects of the originally known problem" (citations omitted)).

Moreover, application of the single-remediation principle in these circumstances is not unfair because nothing precluded Plaintiff from bringing a Section 107 cost recovery action against Defendants prior to the expiration of the limitations period. Evidence in the record indicates that Plaintiff was aware well before it initiated the 2007 soil excavation and disposal that certain Defendants might be responsible for a share of response costs incurred in relation to the Site and that litigation might be necessary to recover those costs. (*E.g.*, Dkt. No. 254-5, at 3– 4 (1989 NYSDEC decision noting that the Companies had moved to join "several additional parties," including Defendants SMC and GE, to NYSDEC's enforcement action regarding the Site); Dkt. No. 254-10, at 5, 7 (1992 attorney memorandum recounting that Utica Alloys did not "want to be suing a lot of entities" and that the Companies' President, Mr. Jiampietro, did "not want, at this time, to sue General Electric, which is his best customer, or Special Metals, another important customer")). Plaintiff has been addressing the same contamination at the Site for decades and cannot escape the statute of limitations by characterizing the work initiated in 2015 as a new remedial action. *MPM*, 966 F.3d at 225 (noting that a plaintiff cannot escape the statute of limitations by "characterizing subsequent phases of the initial project as new remediations" and that a plaintiff "whose suit is time-barred in such circumstances has suffered no unfairness as the preclusion was simply the result of the plaintiff's needless delay").

Accordingly, because the Court concludes that the 2007 soil excavation and disposal constituted a remedial action and that application of the single-remediation principle is appropriate, Plaintiff's Section 107 claim is untimely as to each Defendant. Defendants' motion for summary judgment on Plaintiff's Section 107 claim is therefore granted.

C.     **CERCLA Section 113 Claim**

Defendants move for summary judgment on Plaintiff's CERCLA Section 113 claim,

arguing that (1) Plaintiff cannot state a viable claim under Section 113(f)(1), and (2) the amended

complaint does not allege a claim for contribution under Section 113(f)(3)(B) and Plaintiff

cannot state any viable or timely claim under that subsection in any event. (Dkt. No. 246-1, at

51–55). Plaintiff responds that it has a viable claim under Section 113(f)(1) and, while

acknowledging that it has not plead a claim under Section 113(f)(3)(B), asserts that it could plead

such a timely claim. (Dkt. No. 264-6, at 46–51).

Under Section 113(f)(1) of CERCLA, "[a]ny person may seek contribution from any

other person who is liable or potentially liable under section 9607(a) of this title, during or

following any civil action under section 9606 of this title or under section 9607(a) of this title."

42 U.S.C. § 9613(f)(1). Defendants argue they are entitled to summary judgment on Plaintiff's

Section 113(f)(1) contribution claim because Plaintiff has not been sued under CERCLA Section

106 or 107, a prerequisite to such a claim. (Dkt. No. 246-1, at 51). Plaintiff responds that Section

113(f)(1) should be construed broadly and that it can state a viable Section 113(f)(1) claim

because it is "subject to CERCLA liability under the 2015 [Consent Order]." (Dkt. No. 264-6, at

47–48).

As the Supreme Court has held, the "clear meaning of the text" in Section 113(f)(1)

"authorizes contribution claims only 'during or following' a civil action under § 106 or

§ 107(a)." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166–68 (2004); *see id.* at 166

("The natural meaning of this sentence is that contribution may only be sought subject to the

specified conditions, namely, 'during or following' a specified civil action."); *Guam v. United*

*States*, 141 S. Ct. 1608, 1613 (2021) ("The § 113(f)(1) anchor provision is especially clear on

this point, allowing contribution "during or following any civil action under §[1]06 of this title or

under §[1]07 of this title."). It is undisputed here that Plaintiff has not been *sued* under Section 106 or 107. *See Niagara Mohawk*, 596 F.3d at 122 (noting, after *Cooper Industries*, that Niagara Mohawk "correctly conceded that it could not proceed with a contribution claim under § 113(f)(1)—it had not been sued under § 106 or § 107(a)").

While not entirely clear, Plaintiff appears to argue that it can nonetheless bring a Section 113(f)(1) contribution claim because it has been subject to "pre-litigation regulatory action" imposing CERCLA liability and which counts as a "civil action" under Section 106 or 107(a). (Dkt. No. 264-6, at 47–48 (referring to the 2015 Consent Order)).[20] Plaintiff cites to two out-of-Circuit cases which held that a Section 106 administrative order qualifies as a "civil action under" Section 106 or 107(a) for purposes of Section 113(f)(1). (*Id.* (first citing *PCS Nitrogen, Inc. v. Ross Dev. Corp.*, 104 F. Supp. 3d 729, 742–43 (D.S.C. 2015) (holding that a Section 106 order issued by the EPA qualifies as a civil action under Section 106, but noting that "[s]everal district courts" have concluded to the contrary); and then citing *Carrier Corp. v. Piper*, 460 F. Supp. 2d 827, 840–41 (W.D. Tenn. 2006) (finding that a unilateral administrative order issued by the EPA constituted a "civil action" under Section 113(f)(1)))).[21] It is undisputed here, however, that the EPA never issued a Section 106 administrative order against Plaintiff, rendering *PCS Nitrogen* and *Carrier Corp.* inapposite. To the contrary, courts in the Second Circuit have consistently rejected Section 113(f)(1) claims where the plaintiff fails to show the existence of a Section 106 abatement order or that it has been sued under Section 106 or 107(a). *See W.R.*

---

[20] To the extent Plaintiff relies on the savings clause in Section 113(f)(1), *see* 42 U.S.C. § 9613(f)(1) ("Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title."), its reliance is misplaced. "The sole function of [this] sentence is to clarify that § 113(f)(1) does nothing to 'diminish' any cause(s) of action for contribution that may exist *independently* of § 113(f)(1)." *Cooper Indus.*, 543 U.S. at 166–67 (emphasis added). The savings clause is therefore immaterial to the viability of Plaintiff's Section 113(f)(1) claim itself.

[21] The *Cooper Industries* Court did not decide whether "an administrative order under § 106" "would qualify as a 'civil action'" under Section 106 or 107(a). 543 U.S. at 168 n.5.

*Grace & Co.–Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 89–90 (2d Cir. 2009) (noting that "a party

may pursue a contribution claim under section 113(f)(1) only if that party has been subject to a

civil action as specified in that section" but that a PRP "who has remediated a contaminated site

pursuant to an administrative consent order has a cause of action to pursue necessary associated

costs under section 107"); *AMW Materials Testing, Inc. v. Town of Babylon*, 187 F. App'x 24, 26

(2d Cir. 2006) (summary order) (noting that plaintiffs "failed to satisfy the statutory requirements

for bringing a claim of contribution under Section 113(f)(1) where they "failed to show that [a

Section 106 abatement order] was issued"); *Town of Oyster Bay v. Northrop Grumman Corp.*,

No. 05-cv-1945, 2006 WL 8439567, at *6, 2006 U.S. Dist. LEXIS 114560, at *16 (E.D.N.Y.

May 2, 2006) (holding that a town administrative consent order did not constitute a "civil action"

under Section 106 or 107 and noting that an administrative order under Section 106 "is

something 'in addition to' and separate from any 'other action taken by a State or local

government'" (citation omitted)).

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's

Section 113(f)(1) contribution claim. In light of Plaintiff's acknowledgment that "it has not plead

a claim pursuant to CERCLA § 113(f)(3)(B)," (Dkt. No. 264-6, at 48–49), and the fact that

Plaintiff has not sought leave to amend its amended complaint to add such a claim, the Court

does not reach the parties' arguments regarding whether Plaintiff could state a viable and timely

claim under Section 113(f)(3)(B).

### D.    Declaratory Judgment Claim

Count IV of the amended complaint seeks a declaratory judgment pursuant to CERCLA

Section 113(g)(2) and the Declaratory Judgment Act, 28 U.S.C. § 2201, which "allocat[es] future

Site Related Costs and damages among [Plaintiff] and Defendants, and hold[s] Defendants liable

for their share of future Site Related Costs as allocated to it." (Dkt. No. 43, ¶¶ 68–71).

SPA-55

Defendants argue that Plaintiff's claim for declaratory judgment must be dismissed because Plaintiff "does not have a viable or timely CERCLA claim." (Dkt. No. 246-1, at 55). Plaintiff does not respond to this argument.

The Court agrees with Defendants. A claim for declaratory relief is "not an independent cause of action," *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 106 (2d Cir. 2021), and requires a "valid legal predicate," *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012). Because Defendants are entitled to summary judgment on Plaintiff's CERCLA claims, the Court dismisses Plaintiff's claim for declaratory judgment in connection with those claims. *Cf. BASF Corp. v. Albany Molecular Research, Inc.*, No. 19-cv-134, 2020 WL 705367, at *13, 2020 U.S. Dist. LEXIS 24240, at *32 (N.D.N.Y. Feb. 12, 2020) ("Since the Court has dismissed Plaintiff's [CERCLA] cost recovery claims, the Court dismisses Plaintiff's requests for declaratory relief made in connection with its § 107(a) claims."); *Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 480 F. Supp. 3d 430, 444 n.6 (E.D.N.Y. 2020) ("Because the Court finds that the [complaint] does not plausibly allege a [CERCLA] section 107 claim, the Court dismisses Plaintiff's Declaratory Judgment Act claim without prejudice." (citation omitted)).

## V.   STATUS REPORT OR SUPPLEMENTAL LETTER BRIEFS

In light of the Court's ruling granting Defendants' motion for summary judgment as to Plaintiff's CERCLA claims, the parties are directed to meet and confer by April 17, 2023 regarding the status of this case and how the parties seek to proceed at this point. Specifically, the parties are directed to meet and confer regarding how they seek to proceed with the

SPA-56

remaining state-law claims,[22] how they seek to proceed on the issue of sanctions, and whether a mediation or settlement conference might assist a settlement in this case. The parties are directed to file a status report regarding this meet and confer conference by April 24, 2023. The parties may file a letter brief, not longer than fifteen pages, with their position by May 15, 2023. To the extent Defendants are in agreement on any issues, those should be presented in one joint letter brief. The Court will consider whether to hold a conference following receipt of these submissions.

## VI.  CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for spoliation sanctions (Dkt. No. 246) is **GRANTED in part**; and it is further

**ORDERED** that the Court's selection of a spoliation sanction is **DEFERRED**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 246) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's CERCLA Section 107(a) claim (Count I), CERCLA Section 113(f)(1) claim (Count II), and declaratory judgment claim (Count IV) are **DISMISSED with prejudice**; and it is further

**ORDERED** that the parties are directed to submit a status report and/or supplemental letter briefing as set forth above.

**IT IS SO ORDERED.**

Dated: <u>March 27, 2023</u>

Brenda K. Sannes
Chief U.S. District Judge

---

[22] Defendants requested that, if the Court granted their motion for summary judgment on Plaintiff's federal claims, that it decline to exercise supplemental jurisdiction over Plaintiff's state-law claims. (Dkt. No. 246-1, at 55 n.37). Plaintiff did not respond to this point.

54

SPA-57

| 10/02/2023 | 300 | TEXT ORDER: Based on the parties' stipulation (298), which is so-ordered, Defendants' request for spoliation sanctions is DENIED as moot. Now that the issue of sanctions is resolved, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining State Law claims. See 28 U.S.C. § 1367(c)(3); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."). The Clerk of the Court is directed to enter Judgment in Defendants' favor, dismiss the State Law claims (Counts III and V) in the Amended Complaint 43 without prejudice, and close the case. SO ORDERED by Chief Judge Brenda K. Sannes on 10/2/2023. (nmk) (Entered: 10/02/2023) |
| --- | --- | --- |